IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 22-12792-D

_____

UNITED STATES OF AMERICA,

Appellee,

v.

TRAVIS MCMICHAEL,

Appellant.

_____

**BRIEF OF APPELLANT**

_____

Amy Lee Copeland
Georgia Bar No. 186730
Rouse + Copeland LLC
602 Montgomery Street
Savannah, Georgia 31401
(912) 807-5000

Attorney for Appellant

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| vs. | ) | No. 22-12792-D |
| | ) | |
| TRAVIS MCMICHAEL, | ) | |
| | ) | |
| Appellant. | ) | |

**CERTIFICATE OF INTERESTED PERSONS**

As required by 11th Cir. Rule 26-1, Appellant Travis McMichael files his certificate of interested persons as follows:

Arbery, Ahmaud

Balbo, Attilio Joseph

Balbo & Gregg, Attorneys at Law, PC

Bernstein, Barbara (Bobbi)

Bryan, William "Roddie"

Cheesbro, Honorable Benjamin W.

Copeland, Amy Lee

C-1 of 2

*United States v. McMichael*, No. 22-12792-D

J. Pete Theodocion, PC

Lyons, Tara M.

McMichael, Gregory

McMichael, Travis

Perras, Christopher J.

Rouse + Copeland, LLC

Steinberg, Jill

Theodocion, James Pete

Wood, Honorable Lisa G.

There are no publicly traded corporations to disclose.

This 3rd day of March, 2023.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

Rouse + Copeland, LLC
602 Montgomery Street
Savannah, Georgia 31401
912-807-5000
912-335-3440 (fax)
ALC@roco.pro

C-2 of 2

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Travis McMichael raises novel issues about the extent of federal jurisdiction in cases alleging interference with rights under 18 U.S.C. §245 and attempted kidnapping under 18 U.S.C. §1201. The former asks the Court to determine the meaning of "provide or administer" in the statute where the county has expressly rejected the duty of care over neighborhood streets and has manifested acceptance of that duty only as to drainage and elevation, particularly where the indictment identified the public facility only as a "street," not as the broader right-of-way. The latter asks the Court to determine whether a truck is an instrumentality of interstate commerce given the evidence adduced at trial, and even if it is, whether the use of a truck as a barricade signifies its use as an instrumentality of commerce. These dispositive issues have not been authoritatively decided, which counsels the grant of oral argument under Fed. R. App. P. 34(a)(2)(B). McMichael thus asks for oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................. i

TABLE OF CONTENTS ......................................................... ii

TABLE OF CITATIONS ....................................................... v

STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES ...................................................................... x

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ................................................................ 1

STATEMENT OF THE ISSUES ................................................. 2

STATEMENT OF THE CASE ................................................... 3

   1. Course of proceedings and disposition in the court below ............. 3

   2. Statement of the facts .................................................. 4

      a. The streets of Satilla Shores ...................................... 5

        i. The plat of Satilla Shores subdivision, the developer's offer of dedication, and the County's rejection of that offer ................... 6

        ii. The service tickets for Satilla Shores .................................... 9

        iii. The County Commission Minutes (GX 106) ........................ 13

        iv. The 2021 list of public roads (GX104) and the Facebook post (GX 67) ......................................................................... 18

    b. The detention with a pickup truck .............................................. 19

  3. Statement of the standard of review ............................................. 21

SUMMARY OF THE ARGUMENT ...................................................... 23

ARGUMENT AND CITATION OF AUTHORITY ................................. 25

  Issue One: The government did not prove beyond a reasonable doubt that Glynn County "provided or administered" the streets of Satilla Shores neighborhood, meaning that insufficient evidence supports the jury's verdict on the 18 U.S.C. §245(b) and 18 U.S.C. §924(c) convictions.......................................................................................... 25

    1. While streets can be "facilities" under §245, only two cases involving parades discuss what it means to "provide or administer" a facility ................................................................. 28

    2. Property rights are creatures of state law ................................ 31

    3. A subdivision developer may offer to dedicate streets to a public entity, but that entity may expressly reject the dedication...... 33

    4. The county did not impliedly accept the offered dedication of these streets ................................................................................ 34

    5. The government's evidence does not demonstrate an implied acceptance of the offered dedication so as to support any finding that the county provided or administered those streets ........... 43

      a. The "PrivatePublicRoads2021" list (GX 104) does not reflect dominion, control, or administration, and the list is after the relevant date of February 23, 2020 ....................................... 43

      b. The service tickets (GX 105) do not reflect dominion, control, or administration over the roads; they show instead an acceptance, whether express or implied, of maintenance for the drainage system ............................................................. 44

iii

c.  The largely undated and often incomplete documents in GX 106 do not show the county's dominion over, or control or administration of, the Satilla Shores neighborhood streets on February 23, 2020 ................................................................. 46

d.  What people say on Facebook is not the law ....................... 48

6.  The government did not prove that Glynn County "provided or administered" the Satilla Shores streets .................................. 49

Issue two: The district court abused its discretion, and committed plain error, when it admitted into evidence government's exhibit 67, a Facebook thread between anonymous Satilla Shores neighbors that offered a legal opinion that the streets were public and conveyed advice about how to privatize the neighborhood streets ................................... 52

Issue three: The district court abused its discretion when it admitted the NICB affidavit to prove the instrumentality prong of the attempted kidnapping charge .................................................................................. 56

Issue four: The government did not prove beyond a reasonable doubt that McMichael used an instrumentality of interstate commerce in committing the attempted kidnaping charge ........................................ 60

1.  The government did not prove that the Ford pick-up truck was an instrumentality of interstate commerce .............................. 62

2.  The government did not prove that the truck was being used as an instrumentality of interstate commerce in the commission of a crime ......................................................................................... 62

CONCLUSION ........................................................................................ 66

CERTIFICATE OF COMPLIANCE ...................................................... 67

CERTIFICATE OF SERVICE ................................................................ 68

## TABLE OF CITATIONS

## <u>Cases</u>

*Bryant v. Kern & Company, Inc*. 196 Ga. App. 165 (1990)..................... 41

*Cedar Point Nursery v. Hassid,* ___ U.S. ___, 141 S. Ct. 2063, 2076

(2021) ................................................................................................. 32

*Corner Pocket of Sioux Falls, Inc. v. Video Lottery Technologies, Inc.*,

123 F.3d 1107, 1113 (8th Cir. 1997)......................................................... 60

*Delaware v. New York*, 507 U.S. 490, 501-02 (1993) ............................. 32

*Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1249 (11th

Cir. 2008) ................................................................................. 59, 63-64

*General Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S. Ct. 512, 517 (1997)

.............................................................................................................. 22

*Hemphill v. New* York, ___ U.S. ___, 142 S. Ct. 681, 693 (2022)............ 54

*Hibbs v. City of Riverdale*, 277 Ga. App. 889 (1997) ................... 37-38, 43

*Johnson & Harber Constr. Co. v. Bing,* 220 Ga. App. 179, 181 (1996) .. 40

*Kaplan v. City of Sandy Springs*, 286 Ga. 559, 560 (2010) ............... 35-37

*Lowry v. Rosenfeld*, 213 Ga. 60, 63 (1957) .............................................. 33

*Maschmeier v. Scott*, 269 Fed. Appx. 941, 943 (11th Cir. 2008)........ 43-44

*Merlino v. City of Atlanta*, 283 Ga. 186, 188-89 (2008) .......................... 44

*Perez v. New Auto Image Mkg., Inc.*, 2016 WL 7540272 (S.D. Fla. May 20, 2016) ......................................................................................... 65-66

*Rodriguez v. Federal Deposit Inc. Co.*, ___ U.S. ___, 140 S. Ct. 713, 718 (2020) .................................................................................................. 32

*Ross v. Hall County Bd. of Commrs.,* 235 Ga. 309, 310 (1975) .. 33, 42, 44

*Rouse v. City of Atlanta*, 353 Ga. App. 542 (2020) ...................... 38-39, 44

***Teague v. City of Canton*, 267 Ga. 679, 681 (1997) ................... 35, 40, 45

*United States v. Allen*, 341 F.3d 870, 876 (9th Cir. 2003) ...................... 50

*United States v. Ballinger*, 395 F.3d 1218, 1225 (11th Cir. 2005)........... 63

*United States v. Bishop*, 66 F.3d 469, 597-600 (3d Cir. 1995) ..............64

*United States v. Bledsoe*, 728 F.2d 1094, 1095 (8th Cir.1984) .............. 50

*United States v. Cazare*s, 788 F.3d 956, 990 (9th Cir. 2015)...............50

*United States v. Craft*, 535 U.S. 274, 278 (2002) .................................... 32

*United States v. Cruz-Valdez,* 773 F.3d 1541, 1546 (11th Cir. 1985)...... 47

*United States v. Franklin*, 704 F.2d 1183 (10th Cir.1983)(same) .......... 50

*United States v. Gamory,* 635 F.3d 480, 497 (11th Cir. 2011)................. 21

***United States v. Griffin,* 585 F. Supp. 1439, 1446, n. 1 & 2 (M.D.N.C. 1983) ........................................................................................ 28, 49-51

*United States v. Grzybowicz,* 747 F.3d 1296, 1304 (11th Cir. 2014) ....... 21

*United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999) .............. 22

*United States v. King*, 57 F.4th 1334, 1340-41 (11th Cir. 2023). ............ 55

*United States v. Lopez*, 514 U.S. 549, 558 (1995) ............................. 62-63

*United States v. Madden*, 733 F.3d 1313, 1314 (11th Cir. 2013)............. 45

*United States v. Mungia*, 114 F.3d 1181, 1997 WL 256701 at *1 (5th Cir.

1997) ..................................................................................... 28

*United States v. Nelson*, 277 F.3d 164, 192-93 (2d Cir. 2002) .......... 28, 50

*United States v. Rodriguez,* 732 F.3d 1299, 1303 (11th Cir. 2013) ......... 47

*United States v. Sandstrom*, 594 F.3d 634, 641 (8th Cir. 2010)............. 50

*United States v. Schiffman*, 552. F.2d 1124, 1125 (5th Cir. 1997).......... 55

*\*United States v. Small*, 988 F.3d 241, 248 (6th Cir. 2021) .............. 64-65

*United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006)............... 22

*United States v. Three Juveniles*, 886 F. Supp. 934, 945 (D. Mass. 1995)

..................................................................................................... 29

*United States v. Vonn*, 535 U.S. 55, 62, 122 S. Ct. 1043, 1048 (2002) ... 22

*\*United States v. White*, 846 F.2d 678 (11th Cir. 1988)............... 29, 49-50

*Watson v. Clayton County*, 214 Ga. App. 225 (1994) ............................. 34

*Wooden v. United States*, ___ U.S. ___, 142 S. Ct. 1063 (2022) ............. 51

## **Statutes**

18 U.S.C. §245 ............................................................... *passim*

18 U.S.C. §245(b) ...................................................... x, 2, 25

18 U.S.C. §245(b)(1)(B) ..................................................... 51

18 U.S.C. §245(b)(2)(B) ................................................... 1, 5

18 U.S.C. §247 ............................................................. 63

18 U.S.C. §924(c) .................................................. x, 1-2, 25

18 U.S.C. §1201 ........................................................ *passim*

18 U.S.C. §1201(a)(1) ................................................. 56, 61

18 U.S.C. §1201(a)(1), (d) ........................................... 1, 56

18 U.S.C. §1201(d) ........................................................ 61

18 U.S.C. §1291 ............................................................ 1

18 U.S.C §3231 ............................................................. 1

42 U.S.C. §1983 ........................................................... 43

O.C.G.A. §45-6-5 ...................................................... 38, 43

## **Rules**

11th Cir. R 28-5 ........................................................... 1

Fed. R. App. P. 28(i) ...................................................... x

Fed. R. App. P. 28(a)(6) .................................................. 4

Fed. R. App. P. 4(b)(1)(A)(i) .................................................................. 1

Fed. R. App. P. 32(a)(5) ..................................................................... 67

Fed. R. App. P. 32(a)(6) ..................................................................... 67

Fed. R. App. P. 32(a)(7)(B)(i) ............................................................ 67

Fed. R. App. P. 34(a)(2)(B) ................................................................. i

Fed. R. Crim. P. 52(a) ....................................................................... 22

Fed. R. Evid. 902(11) ......................................................................... 57

## **Other**

11th Cir. R 28-1(f) ................................................................................ x

**STATEMENT OF ADOPTION OF BRIEFS OF OTHER PARTIES**

Pursuant to Fed. R. App. P. 28(i) and 11th Cir. R 28-1(f), Appellant Travis McMichael adopts by reference the portions of the brief of his co-defendant and co-appellant Greg McMichael that challenge 1) whether there was sufficient evidence to prove that Glynn County "provided or administered" the streets of Satilla Shores neighborhood for purposes of his 18 U.S.C. §245(b) and 18 U.S.C. §924(c) convictions and 2) whether the government presented sufficient evidence to support the 18 U.S.C. §1201 conviction for attempted kidnapping.

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

An indictment charged Travis McMichael with one count of interference with rights under 18 U.S.C. §245(b)(2)(B); one count of attempted kidnapping under 18 U.S.C. §1201(a)(1), (d); and one count of discharging a firearm during and in relation to a crime of violence under 18 U.S.C. §924(c). (Doc 1)[1] A jury convicted McMichael on all three counts. (Doc 218) On August 18, 2022, the district court entered its judgment sentencing McMichael to consecutive sentences of life plus ten years. (Doc 265) McMichael appealed on August 22, 2022. (Doc 272) The notice of appeal is timely. *See* Fed. R. App. P. 4(b)(1)(A)(i).

Since the counts of conviction state a violation of federal laws, the district court had jurisdiction pursuant to 18 U.S.C. §3231. This Court has jurisdiction over this direct appeal under 18 U.S.C. §1291.

---

[1] As required by 11th Cir. R. 28-5, McMichael cites the record by document and page number. He cites the trial transcript by the document number, the page number in the header generated by the district court's filing system, and the sequential page number assigned by the court reporter. Government and defense exhibits are, respectively, "GX" and "DX."

## STATEMENT OF THE ISSUES

1. The government did not prove beyond a reasonable doubt that Glynn County "provided or administered" the streets of Satilla Shores neighborhood, meaning that insufficient evidence supports the jury's verdict on the 18 U.S.C. §245(b) and 18 U.S.C. §924(c) convictions.

2. The district court abused its discretion, and committed plain error, when it admitted into evidence government's exhibit 67, a Facebook thread between anonymous Satilla Shores neighbors that offered a legal opinion that the streets were public and conveyed advice about how to privatize the neighborhood streets.

3. The district court abused its discretion when it admitted the NICB affidavit to prove the instrumentality prong of the attempted kidnapping charge.

4. The government did not prove beyond a reasonable doubt that McMichael used an instrumentality of interstate commerce in committing the attempted kidnaping charge.

## STATEMENT OF THE CASE

### 1. Course of proceedings and disposition in the court below.

This case arises from the shooting death of Ahmaud Arbery, a Black man, on February 23, 2020, in the Satilla Shores neighborhood of Glynn County, Georgia. Travis McMichael shot and killed Arbery; Travis's father Greg, who was armed, was with Travis at the time; and William "Roddie" Bryan recorded the events.[2] The appellants are white.

A federal grand jury indicted McMichael on an interference-with-rights charge (§245); one count of attempted kidnapping (§1201); and on one count of discharging a firearm during and in relation to a crime of violence – i.e., the §245 charge (§924(c)). (Doc 1)[3] The jury convicted McMichael on all three counts and made specific findings on the §245 and §924(c) charges. (Doc 218) On the former, the jury found that the crime involved use of dangerous weapons; included an attempt to kidnap Arbery; and resulted in Arbery's death. (Doc 218-Pg 2) On the

---

[2] Throughout this brief, "McMichael" refers to Travis McMichael. The brief will use "Travis" and "Greg" when referring to events involving both men.

latter, the jury found that McMichael discharged a firearm during the §245 crime of violence. (Doc 218-Pgs 5-6)

The district court sentenced McMichael to consecutive sentences of life plus ten years. (Doc 265) Due to prior state convictions arising from these events, McMichael currently is serving consecutive sentences of life without parole plus 20 years in the Georgia Department of Corrections. (Presentence Investigation Report, ¶3) His federal sentence runs concurrently. (Doc 265-Pg 2)

## 2. **Statement of the facts.**

A party's appeal brief must set forth "the facts relevant to the issues submitted for review." *See* Fed. R. App. 28(a)(6). McMichael focuses his factual recitation on the issues he raises on appeal, where he cites to the evidence adduced at trial. Paragraphs six through 47 of the PSI describe the underlying facts, subject to McMichael's objection to the characterization of the streets of the Satilla Shores neighborhood as public streets (PSI Addendum), which McMichael discusses next.

**a. The streets of Satilla Shores**

In an interference-with-rights charge, one of the things that the government must prove is that the interference occurred because a person was "participating in or enjoying any benefit, service, privilege, program, facility, or activity provided or administered by a State or subdivision thereof." 18 U.S.C. §245(b)(2)(B). Here, the indictment identified the facility as a "public street in the Satilla Shores neighborhood" that was "provided and administered" by a governmental entity. (Doc 1-Pg 1) Four streets comprise Satilla Shores: Satilla, Burford, Holmes, and Zellwood. Zellwood is a partially private street. (Doc 250-Pgs 172-73, TR 1542-43) The government seemingly does not pursue a claim that Zellwood was a public street. (Doc 233-Pg 5)

The government called one witness and presented four documentary exhibits relative to this prong. The witness was Anthony Vicent, an engineer who since November 2016 worked for the Glynn County Department of Public Works ("DPW") and at trial served as its roads and drainage division manager. (Doc 250-Pgs 141-42, 160-61; TR 1511-12, 1530-31) Vicent had no personal knowledge of anything that occurred at DPW prior to his employment and had no recollection about

any work done in Satilla Shores. (Doc 250-Pgs 160-61, 167, TR 1530-31, 1537) While he gave testimony generally about the DPW, his testimony about Satilla Shores specifically came from a plat by the developer, 101 pages of DPW service tickets, the often undated and incomplete County Commission records supplied by the government, and a county list of public roads dated and generated after February 23, 2020. The government also introduced a Facebook message through another witness.

i.    <u>The plat of Satilla Shores subdivision, the developer's offer of dedication, and the County's rejection of that offer</u>

Vicent testified that the DPW's primary responsibilities were "to keep the public right-of-ways safe for people to drive on and to maintain the drainage throughout Glynn County." (Doc 250-Pg 142, TR 1512) Since the indictment charged only "streets," McMichael asked Vicent to clarify what he meant by "right-of-way":

Q. . . So a street is what cars drive on?

A. Yes.

Q. And people walk their dogs on?

A. Uh-huh.

Q. . . .And there's a term – you used it earlier – it's called the right-of-way?

A. Yes.

Q. That's actually broader than a street; is that true?

A. Yes.

Q. I think of it like a layer cake and you have a layer [of] cake with a broad strip of icing on each side. Is that a pretty good analogy?

A. That's fair.

Q.. . So a right-of-way is, for instance, a street with sidewalks or drainage easement on each side. Is that a fair characterization of what that is?

A. Yes.

*****

Q. So again street in the middle, easements on each side; is that correct?

A. Yes.

(Doc 250-Pgs 163-64, TR 1533-34)

In residential developments, private contractors or developers – not the County – build streets and rights-of-way. (Doc 250-Pg 164, TR 1534) The Satilla Shores developer generated a subdivision plat that said

We the undersigned owners of the area . . . *dedicate to the use of the public forever all streets, ways, alleys, et cetera, as shown on said plat*. . . this 17th day of January 1958.

(Doc 250-Pgs 153, 159-60, TR 1523, 1529-30; GX 103)(emphasis added) This language is a dedication, which is a fancy way of saying, "Glynn County, here are all of my public streets. . . It's on you now to take care of them." (Doc 250-Pg 165, TR 1535) Vicent acknowledged that DPW's "boss" was the County Commission. (Doc 250-Pg 165, TR 1535) So McMichael asked Vicent to read from County Commission minutes dated January 22, 1958 (i.e., *after* the developer's proposed dedication):

> Motion . . . to approve the plat of Satilla Shores subdivision, property of Zell Finance Company. . .and approved by county engineer as to elevation and drainage of the area involved but *expressly excluding the acceptance of dedication at this time of any and all dedications [of] streets or ways . . . .*

(Doc 250-Pg 167, TR 1537; GX 13)

When asked if it appeared that the County Commission rejected the dedication of the Satilla Shores subdivision, Vicent simply replied, "It said at that time" and later that this decision "would not prevent [the County Commission] from accepting [the dedication] at a later point. (Doc 250-Pg 176, TR 1546) But the government introduced no County Commission minutes showing an acceptance of the streets' dedication at any "later point."

The government instead presented service tickets from Satilla Shores neighborhood and often incomplete and undated copies of County Commission minutes. To understand the significance of this evidence, it is helpful to understand McMichael's defense at trial: That the County expressly rejected the obligation to care for the *streets* of Satilla Shores neighborhood, and limited its care to drainage and elevation, which is what it accepted either expressly or impliedly. (Doc 229-Pgs 1-33; Doc 252-Pgs 80-84, TR 1912-16) The service tickets show a host of activity undertaken by the County on drainage issues, but no *significant* activity (and very little activity at all) on the streets. The Commission minutes show that that body may have, at some time, included the neighborhood streets in its discussions, but the government presented no evidence that the County acted performed, or paid for, any work on the streets themselves.

ii.    <u>The service tickets for Satilla Shores</u>

The government introduced 101 pages of service tickets – 22 of which post-dated February 23, 2020 – from Satilla Shores and questioned Vicent about three. (Doc 250-Pgs 147-51, TR 1517-21; GX 105) The first involved the use of the words "filled with asphalt," but

that was incident to a drainage project. (Pgs 149-50, 169-71, TR 1519-20, 1539-40) The second involved a neighbor's calling DPW about a hydraulic spill from a garbage truck, which was remedied when DPW called the garbage company. (Doc 250-Pg 150, TR 1520; GX 105-067) The third involved an intersection that flooded when it rained, apparently due to a ditch. (Doc 250-Pg 151, TR 1521)

The 101 service tickets comprising government's exhibit 105 are coded the type of call, listed below as corresponding to the page number in the exhibit:

**Ditches (24 tickets):** 002, 005, 006, 007, 008, 016, 022, 025[4], 029, 030, 034, 035, 036, 038, 042, 043, 044, 046, 049, 050, 071[5], 077, 082, 101

**Mosquitos (31 tickets):** 003, 010, 011, 012, 013, 017, 018, 019, 020, 021, 023, 027, 032, 037, 039, 047, 051, 052, 053, 054, 066, 073, 074, 078, 084, 085, 086, 097, 098, 099, 100

**Drainage (11 tickets):** 004, 015, 045, 065, 067, 080, 081, 083, 089, 092, 093

---

[4] A private company dropped dirt in the road, so public works "hauled loader to Zellwood and pushed dirt out of roadway."

[5] The homeowner asked the county to "clean all curbing in this area" due to recent flooding and inadequate catch basins.

**Cross Drain (3 tickets):** 040, 069-070[6]

**Right of Way issue (3 tickets):** 041,[7] 058,[8] 060

**Complaint (3 tickets):** 048[9], 090, 091[10]

**Bulk Waste – Schedule Pickup (5 tickets):** 055, 075, 076, 088, 096

**Driveways (1 ticket):** 059

**Storm Debris Cleanup (5 tickets):** 061, 062, 063, 064, 087

**Road (11 tickets)**: 009, 014, 024, 026, 028, 031, 033, 056, 079, 094, 095

**Roadway Spill (1 ticket):** 057

**Traffic (2 tickets):** 068, 072

---

[6] This cross-drain repair necessitated the pouring of asphalt following the repair of the grate.

[7] A tree fell in front of a Zellwood house; the County removed the tree and concluded that the stump "needs to be removed from [sic] right-of-way."

[8] A large limb fell on a power line in the right of way and Georgia Power did not remove the debris. Complaint 060 similarly concerned tree debris in the right of way on the "side of st."

[9] The complaint was a "sinkhole in front of house by mailbox," which the county apparently repaired.

[10] The complaints in 090 and 091, originating from the same address, involved a sinkhole in the yard.

Of the 101 tickets, 14 involved a complaint about the "road," a "roadway spill," or "traffic." Eight of the 11 "road" complaints originated from two houses on Zellwood.[11] The three remaining road calls 1) ask for a street sweeper (105-094), 2) report "2 sinkholes in the front yard" (105-095), and 3) suggest that Georgia Power removed a limb that it left on the side of the road. (105-079)

The roadway spill service request involved the garbage truck, and one "traffic" complaint involved pouring asphalt to remedy a drainage problem, both of which Vicent testified about at trial. The final "traffic" service ticket (105-072) sought the placement of speed bumps, to which the ticket replied, "No Work Needed." No speed bumps are on any street in Satilla Shores. (Doc 250-Pg 172, TR 1542)

These service tickets overwhelmingly went to drainage, ditches, and mosquitos. The only asphalt repairs came in conjunction with the county's drainage work (105-058, 105-067, 105-068-105-070). The only ostensible road-related work done on Satilla, Holmes, and Burford over

[11] The eight Zellwood complaints involve homeowner requests to trim or address tree limbs on the right of way (105-009, 105-026, 105-028, 105-033); send a street sweeper (105-056); and mow the right of way (105-014, 105-024, 105-031). Mowing a right-of-way usually was the homeowners' responsibility. (Doc 250-Pg 169, TR 1539)

12

the 14-year period reflected in the service tickets was 1) promising a

visit from the street sweeper to Satilla Drive in April 2019 (105-94) and

2) contacting a garbage company about a hydraulic spill from its truck

(105-057).

That's it.

iii.    The County Commission minutes (GX 106)

Over McMichael's objection, the government introduced on

redirect through Vicent a composite exhibit of largely undated, usually

unpaginated, and often incomplete County Commission minutes. (Doc

250-Pgs 178-80, TR 1548-60) Vicent did not know the date of the

undated minutes, the outcome of the incomplete minutes, or whether

any work was actually done – offering instead that the roads are "paved

now." (Doc 250-Pgs 184-189, TR 1554-59) But the government presented

no evidence about the composition of the roads (asphalt, concrete,

something else), the lifespan of roads before they required paving, or

that the County did any paving of these roads other than pouring

asphalt incident to a drainage repair. The only evidence was that the

developer paved the road. (Doc 250-Pgs 153, 159-60, 164, TR 1523,

1529-30, 1534; GX103)

Undated exhibit 106-002 states that the Commission "accept[ed] the low bid" of a construction company "in the amount of $74,361.40 on Grading, Draining, Base and Paving .93 miles" on seven "county roads," including Holmes and Satilla. Vicent had no personal knowledge "[o]ther than the records." (Doc 250-Pg 185, TR 1555) Nothing in the record shows that any work was actually done and paid for by the county. Nothing showed the nature of the work. Nothing showed the date. The heading of this entry included "Draining" – unlike the next entry (which did not include any Satilla Shores streets) for "asphaltic concrete resurfacing."

Exhibit 106-003 is entitled "FY 88-89 ITEMS TO CARRYFORWARD TO FY 89-90" and is dated July 20, 1989. Under "General Fund County Roads Continued," entry #14 is

Satilla Drive – Begin at US 17 and end at Burford Road, .35 miles . . . County Roads 4,043

Although other roads on the list carry some description about the type of work to be performed, there is no indication of what type of work is contemplated as to Satilla or Zellwood Drives. The carryforward amount (line #20) describes the prior 19 entries as "Projects," and line #21 specifically refers to "Base/Paving Drives. . . ." This exhibit – a

single page of the minutes – reflects *only* that a motion was made and seconded to "approve this request." Vicent again had no knowledge about anything related to this entry. (Doc 250-Pgs 185-86, TR 1555-56)

Next, undated exhibit 106-004 to 106-005 has a section entitled Execution of Various Right-of-Way Documents Required by Department of Transportation for Paving Sixteen Roads PR-22-(127).

This resolution was to allow county officials to "execute said documents to accommodate paving of" 16 roads, including Burford Road. It is unknown whether any documents were executed. (Doc 250-Pg 186, TR1556)

Undated exhibit 106-006 includes Zellwood Drive on a list of "Approved LARP Resurfacing Priorities for Calendar Year 1990." Vicent did not know what "LARP" was, and he had no idea whether any paving jobs were actually done. (Doc 250-Pgs 186-87, TR 1556-57) Since this is a single page of an apparent multi-page document, it is unclear who "Approved" these priorities; it does not refer to any motion, vote, or adoption by the commission. It, too, goes only to Zellwood, which the government seemingly does not pursue in its "public road" argument. (Doc 233-Pg 5)

Undated exhibit 106-007 has a section entitled "Proposed Street Light Installations"; the Commission, citing policy, did *not* approve the installation of streetlights in Satilla Shores. There was no explanation about that "policy" or any further minutes about streetlights in Satilla Shores. Vicent knew only what was in the minutes. (Doc 250-Pg 187, TR1557)

In 106-008, dated November 2, 2000, the commission approved the issuance to Georgia Power "of a revocable permit for placement of a power pole and anchors on Satilla Drive right-of-way." Vicent thought it was "more than likely" that *Georgia Power* installed the power pole "because it's their jurisdiction," and he allowed that it would go in the right-of-way, not the street itself. (Doc 250-Pgs 187-88, TR 1557-58)

In undated and unpaginated 106-009 to 106-010, the public works director asked the commission to ratify "a list of Larp Resurfacing Projects" that the director previously submitted to the Georgia Department of Transportation. The government highlighted

| Satilla Dr. | Begin at U.S. 17 End at Burford Road | 0.35 |
|---|---|---|

McMichael notes that these are the same locations and street lengths referred to in Exhibit 106-003.[12] Vicent only had the records and had no personal knowledge. (Doc 250-Pg 188, TR 1558)

Finally, 106-11, bearing a date of December 17, 1987, discussed a conversation between the county administrator and DOT officials "with regard to future Glynn County Contract priorities." To that end, the staff "group[ed] these road projects and submit[ted] them under the Chairman's signature for DOT consideration." This entry appeared:

PRIORITY NUMBER 3

  (A)Zellwood Drive                      0.47 Miles

    Begin at Satilla Drive, End at Burford Road

  (B)Burford Road                       0.50 Miles

    Begin at Zellwood Drive, End at Satilla Drive

    REQUEST BASE AND PAVING   Total    0.97 Miles

    PIPE MATERIALS CONTRACT

---

[12] There is no indication in exhibit 106-003 about whether the carryforward request was approved; there was simply a motion made by Commissioner Smith and seconded by Commissioner Highsmith. There is a full list of voting commissioners listed on 106-009 to 106-010; Smith and Highsmith are not on that list. One can infer that these two actions, both involving the same streets and same lengths, were remote in time – suggesting that nothing was done.

Again, Vicent had no knowledge what became of this request. (Doc 250-Pgs 188-89, TR 1558-59)

    iv.   <u>The 2021 list of public roads (GX104) and the Facebook post (GX 67)</u>

The government introduced two other documents, both over objection, on the roads issue. *First*, the government introduced, and the district court admitted, a 2021 list of public and private roads for an encounter that occurred on February 23, 2020. (Doc 250-Pgs 143-45, GX 104) That list showed that Satilla, Holmes, and Burford were public roads, which would allow the county to know whether to respond to a service call for issues like "potholes or blocked drainage." (Doc 250-Pg 147, TR 1517) DPW did not prepare the list: It came from the community development department. (Doc 250-Pg 173, TR 1543) Notably, it was not a list prepared by the County Commission.

*Second*, the government introduced, and the district court admitted over McMichael's objection, a Facebook string of Satilla Shores neighbors talking about privatizing the streets and what lawyers told them to do. (GX 67) McMichael separately challenges the

18

admission of this exhibit based on this objection and the fact that it is hearsay. He discusses these facts in his argument section.

### b. The detention with a pickup truck

On February 23, 2020, Greg and Travis McMichael lived on Satilla Drive in the Satilla Shores neighborhood off Highway 17; Bryan lived in the same neighborhood on Burford Drive. (Doc 248-Pg 125-26, 132, TR 1233-34, 1240) According to the testimony of the lead GBI agent, Arbery was seen on video cameras walking down the street that day and then stopping at a house under construction. (Doc 248-Pgs 137-38, TR 1245-46) When Arbery left the house, he went on Satilla Drive toward the McMichaels' residence. (Doc 249-Pg 141-42, TR 1249-50) Greg was in the front yard working on some boat cushions, and when he saw Arbery, Greg went into the house and got Travis. (Doc 249-Pg 143, TR 1251) Greg got a .357 Magnum; Travis got a shotgun; and both men got into Travis' pickup truck. (Doc 249-Pgs 143-44, TR 1251-52)

The McMichaels followed Arbery down Satilla toward Burford, caught up with him in front of Bryan's house, and told him to stop. (Doc 249-Pg 145, TR 1253) Arbery did not; he changed direction and tried to run back up Burford. (Doc 249-Pg 146, TR 1254) Travis back up the

truck, continued to follow Arbery (who changed direction again), and yelled at him. (*Id*.) Bryan, who had been working outside, saw this interaction and got into his own truck. (Doc 249-Pg 147-48, TR 1255-56) While Bryan yelled "y'all got him," there is no indication that the McMichaels heard him. (Doc 249-Pg 149, 229, TR 1257, 1337)

Toward the end of Burford, the McMichaels "caught up with him," and Travis "pulled his truck and tried to block. . .Arbery's path." (Doc 248-Pg 150, TR 1258) Greg got out of the truck "to engage" Arbery, who changed directions and ran back up Burford. (*Id*.) Meanwhile, Bryan used his truck to try to block Arbery, who went around the front bumper and continued by Burford. (Doc 249-Pg 153, TR 1261) Arbery ran toward the neighborhood exit as Bryan pursued him; Arbery made contact with Bryan's truck in the bed and door areas.  (Doc 249-Pg 154-55, TR 1262-63)

Arbery ran from Bryan onto Holmes Road as the McMicahel turned onto Holmes. (Doc 249-Pg 159, TR 1267) Arbery turned and went back in the direction he came. (Doc 249-Pg 160, TR 1268) Bryan turned around, but the McMichaels "turn on Holmes Road, travel down Holmes Road and park their vehicle." (Doc 248-Pgs 161-62, TR 1269-70)

According to the video recorded by Bryan, Greg was armed and standing in the bed of the parked truck, and Travis was standing with a shotgun in front of the driver's side door, which was open. (Doc 248-Pgs 165-66, TR 1273-74) Arbery changed directions to run around the passenger side of the truck and encountered Travis. (Doc 248-Pgs 166-67, TR 1274-75) Both McMichaels pointed their guns at Arbery. (Doc 248-Pg 171, TR 1279) Arbery tried to grab Travis' shotgun; there was a struggle; and Travis shot and killed Arbery, delivering wounds consistent with grabbing a shotgun. (Doc 250-Pg 135, TR 1505)

### 3. <u>Statement of the standards of review.</u>

McMichael made a post-trial motion for judgment of acquittal preserving the sufficiency challenges he raises. (Doc 228) The Court reviews *de novo* both the sufficiency of evidence supporting a conviction and the denial of a motion for judgment of acquittal. *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011). This review requires the Court to consider the evidence in the light most favorable to the verdict and "draw[] all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Grzybowicz*, 747 F.3d 1296, 1304 (11th Cir. 2014).

The Court reviews the district court's evidentiary rulings for abuse of discretion. *General Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S. Ct. 512, 517 (1997). The Court will not reverse an evidentiary error if it was harmless – i.e., if it "had no substantial influence on outcome and sufficient evidence uninfected by error" sustains the conviction. *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999); *see also* Fed. R. Crim. P. 52(a). The government, not the defendant, bears the burden of showing any error was harmless. *See United States v. Vonn*, 535 U.S. 55, 62, 122 S. Ct. 1043, 1048 (2002). McMichael raises an unpreserved evidentiary challenge, which subjects it to plain error review: He must show error, that is plain, that makes a difference, and that requires a judicial remedy. *See United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006).

## SUMMARY OF THE ARGUMENT

The interference-with-rights statute requires that the action occurred due to a person's use or enjoyment of a "facility . . .provided or administered by a State or subdivision thereof." The indictment specified the "streets of Satilla Shores neighborhood," not the broader right-of-way. The neighborhood's developer paved those streets and offered to dedicate them to the County. The County expressly rejected that dedication, meaning that it did not assume care for the streets of Satilla Shores. The government's evidence, through service tickets and undated County Commission minutes, demonstrated that the County assumed responsibility to care for the elevation and drainage of the neighborhood but not the streets themselves. The government thus did not prove beyond a reasonable doubt that the County provided or administered the neighborhood streets.

In a partially preserved evidentiary objection, the district court abused its discretion and committed plain error when it admitted a Facebook post about privatizing the streets of Satilla Shores, the need to make a homeowner's association to finance street maintenance, and the legal mechanism by which to make it happen. What people say on

23

Facebook is not the law, and hearsay posts cannot change the fact that the County did not provide or administer the neighborhood streets.

The district court erred in admitting an affidavit with a date five days after its admission; that affidavit served as the government's only evidence that McMichael's truck moved in interstate commerce from manufacture to delivery. The government did not provide the underlying business records in discovery, and the affidavit represented the third try by the government.

The attempted kidnapping statute requires the use of an instrumentality of interstate commerce. The indictment identified only the truck.

## ARGUMENT AND CITATION OF AUTHORITY

McMichael raises four issues on appeal.

### Issue one: The government did not prove beyond a reasonable doubt that Glynn County "provided or administered" the streets of Satilla Shores neighborhood, meaning that insufficient evidence supports the jury's verdict on the 18 U.S.C. §245(b) and 18 U.S.C. §924(c) convictions.

The interference-with-rights statute requires that the prohibited act occurred because a person was or had been

> participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof.[13]

18 U.S.C. §245(b). The indictment identifies the "facility" as "a public *street*" in Satilla Shores." (Doc 1-Pg 1)(emphasis added) The indictment, too, specifies §245(b) as the crime of violence for the §924(c) charge. (Doc 1-Pg 5) The factual recitation sets forth the evidence adduced at trial on this issue.

The government did not prove beyond a reasonable doubt that Glynn County "provided or administered" the streets of Satilla Shores neighborhood, meaning that insufficient evidence supports the jury's verdict on the 18 U.S.C. §245(b) and 18 U.S.C. §924(c) convictions.

---

[13] McMichael did not dispute at trial, and does not dispute now, that Glynn County is a political subdivision of the state of Georgia.

McMichael argued that the County expressly rejected the obligation to care for the *streets* of Satilla Shores neighborhood, although it accepted (either expressly or impliedly) the obligation to care for drainage and elevation. (Doc 229-Pgs 1-33; Doc 252-Pgs 80-84, TR 1912-16) The County Commission's partial rejection of the offer of dedication of the streets meant that it assumed no obligation to, and did not, provide or administer those streets. The service tickets led to this conclusion, and the undated and incomplete County Commission minutes did not show any actual road work by the County. The only evidence about paving the streets was that the developer did it.

The district court found that McMichael's arguments "misconstrue[d]" §245:

> The question of whether the streets of Satilla Shores are, in fact, public, may be *related* to the question of whether the streets are "provided or administered" by Glynn County – but they are not coextensive. The County need not have record ownership or formal title. The only sense in which the streets need to be "public" is that they are "provided or administered" by Glynn County. . . .

(Doc 257-Pg 8) Looking to dictionary definitions of "provided" and "administered," and then citing cases about parade permits, the district court concluded that "it is enough that a state or political subdivision maintains the particular facility in a condition suitable for use." (Doc

26

257-Pg 10) The district court cited that the streets were "open to the public," with no gates or restrictions on entry; that a call to the police was about Arbery's trespassing in a private home, not on private streets; and that while Glynn County may not have built or accepted dedication of the streets, it used its resources to maintain the streets and keep them in working order. (Doc 257-Pgs 11-12)

The district court opined that it did "not matter that there was no direct evidence of whether any work actually occurred on the particular stretch of road where Arbery was shot, or that those roads were definitively 'paid for by the county,' . . . because the jury (particularly in the light most favorable to the verdict) could reasonably infer that these things happened." (Doc 257-Pg 14) The district court believed this result inured because the "streets of Satilla Shores were in working order." (Doc 257-Pg 14) And "no witnesses indicated that the streets of Satilla Shores were anything other than provided or administered by Glynn County on the day that Arbery was killed on them" – i.e., February 23, 2020. (Doc 257-Pgs 14-15)

The district court's determination was erroneous.

1. **While streets can be "facilities" under §245, only two cases involving parades discuss what it means to "provide or administer" a facility.**

A handful of cases have summarily concluded, with no discussion of "provide or administer," that public streets can be a "facility" in §245. *See United States v. Nelson*, 277 F.3d 164, 192-93 (2d Cir. 2002) (rejecting argument that "Brooklyn city street on which [victim] was attacked does not count as a 'facility'" under §245; *United States v. Mungia*, 114 F.3d 1181, 1997 WL 256701 at *1 (5th Cir. 1997)(Table) (stating summarily that reasonable trier of fact could have found that "the streets and sidewalks on which the victims were shot qualify as a 'facility . . . provided or administered'"); *United States v. Three Juveniles*, 886 F. Supp. 934, 945 (D. Mass. 1995)(noting summarily that the "streets and sidewalks are facilities administered by Brockton, a subdivision of the Commonwealth of Massachusetts"; *cf. United States v. Griffin,* 585 F. Supp. 1439, 1446, n. 1 & 2 (M.D.N.C. 1983)(noting that a sponsor of the bill in the Senate "stated clearly that this act was designed to protect someone travelling on an interstate highway").

Only two cases – involving a parade or demonstration – discuss what it means for a governmental entity to "provide or administer" a

facility under §245. The district court cited these cases for the proposition that "it is enough [for 'provided or administered'] that a state or political subdivision maintains the particular facility in a condition suitable for use." (Doc 257-Pg 10) That is not what these cases stand for, as McMichael discusses next.

The first case, *United States v. White*, 846 F.2d 678 (11th Cir. 1988), involved a §245 prosecution arising out of a clash between Black marchers led by the Southern Christian Leadership Conference ("SCLC") and members of the Ku Klux Klan. SCLC leaders met with local police before the march "to discuss the details of the parade route and to request police assistance during the demonstration," which led to "augmented" police protection at the march. *Id*. at 682. Nonetheless, Klansmen moved into the street during the march, beat officers with clubs as the police attempted to clear Klansmen from the streets, and breached a police line and ran toward the SCLC marchers. *Id*.

The district court granted judgment of acquittal to a defendant-Klansman, finding that the city did not administer the march. *Id*. at 694-95. This Court reversed that ruling, citing that the

- The city had enacted three ordinances to respond to continuing civil rights demonstrations;

- SCLC representatives met with the police to discuss the time and route of parade, the number of participants, and the vehicles in the march; and

- The police chief agreed to provide protection, called in additional officers, and assigned officers to travel the parade route to prevent interference, which they tried to do during the march itself.

*Id.* at 694. *White* found that "administer" did not require the either the police to "direct" the protest or the protestors to obtain a permit, "especially when the town, city, or county involved does not require that protestors obtain a parade permit." *Id.* at 695. This was especially true since the legislative history of §245 showed that "[r]acially motivated violence during parades, marches, and demonstrations was precisely what this act was designed to redress." *Id.* (cit. omitted).

In the second case, a district court found that a city "administered or provided" a parade where it "had an affirmative responsibility to regulate the time, place and manner of the parade in order to ensure the public order." *United States v. Griffin*, 585 F. Supp. 1439, 1442 (M.D.N.C. 1983). It noted that city ordinance required the demonstrators to apply for a parade permit and detail the objectives, time, date, and proposed route of the parade, and that the city's permit

set forth condition about the parade and made it "at all times subject to the supervision and control of the Police Department of the City of Greensboro." *Id*. These ordinances contained "lengthy and highly specific requirements and regulations applicable to parades, and define[d] the responsibilities and functions of both parade participants and the City." *Id*. "The thorough involvement of the city in the details of the parade, and the city's close supervision and control of the march, qualifie[d] this parade as having been 'administered' by the city" under §245. *Id*.

Neither *White* nor *Griffin* supports the district court's conclusion that "it is enough that a state or political subdivision maintains the particular facility in a condition suitable for use." (Doc 257-Pg 10) Instead, they look to local regulations to answer the question of whether a political entity administered an activity under §245.

2. **Property rights are creatures of state law.**

This Court similarly should consider state law – specifically, the meaning of the unrebutted evidence that the County expressly rejected the developer's offer of dedication of the streets – in its determinations about the streets. Property rights are "creatures of state law." *See*

*Cedar Point Nursery v. Hassid,* ___ U.S. ___, 141 S. Ct. 2063, 2076 (2021)(considering in context of Takings Clause); *Rodriguez v. Federal Deposit Inc. Co.*, ___ U.S. ___, 140 S. Ct. 713, 718 (2020)(observing in bankruptcy case that corporation are creatures of state law, which is "well equipped to handle disputes involving corporate property rights"); *United States v. Craft*, 535 U.S. 274, 278 (2002)(stating in tax case that answer to the question of whether a husband's interest in property "largely depends upon state law"); *Delaware v. New York*, 507 U.S. 490, 501-02 (1993)(noting in discussion of a state's power of escheat that the Constitution does not create property interests, which instead reflect "existing rules or understandings that stem from an independent source such as state law").

Here, the government invoked a state law principle sought to prove "provide or administer" by admitting into evidence and eliciting testimony about the offer of dedication in the Satilla Shores plat. The offer of dedication and its subsequent rejection had a legal effect, which McMichael addresses next.

**3. A subdivision developer may offer to dedicate streets to a public entity, but that entity may expressly reject the dedication.**

The January 17, 1958, plat of the Satilla Shores neighborhood proposed a dedication "to the use of the public forever all streets, ways, alleys, etc., . . . ." (Doc 250-Pg 159, TR 1529; GX 103) This constituted the developer's offer of dedication, which is how a developer asks the County to assume care and maintenance of the streets that he built. (Doc 250-Pgs 159, 165, TR 1529, 1535)[14]

"Dedication is the setting aside of land by the owner for a public use." *Lowry v. Rosenfeld*, 213 Ga. 60, 63 (1957). "A private landowner may dedicate land by setting it apart for public use, . . .but it must be accepted by the county before it becomes a county road." *Ross v. Hall County Bd. of Commrs.,* 235 Ga. 309, 310 (1975). Even though an owner may have expressly offered to dedicate a road via a recorded plat, dedication will not be complete *until the public accepts the express offer*.

---

[14] The record shows that the Satilla Shores developer built the streets. If the County built the Satilla Shores streets, there would be no basis or need for an offer of dedication. Even the district court acknowledged that "Glynn County may not have originally built the streets. . . ." (Doc 257-Pg 11)

*See Watson v. Clayton County*, 214 Ga. App. 225 (1994)(emphasis added)(stressing both dedication and acceptance are required for a public street).

Glynn County expressly and unanimously *rejected* the developer's offer of dedication of the streets on January 22, 1958:

> Motion by Commissioner Paulk, seconded by Commissioner Whittle, to approve plat of Satilla Shores Subdivision, property of Zell Finance Company, Inc., as recommended by the Glynn County Planning Board and approved by County Engineer as to elevation and drainage of the area involved, ***but expressly excluding the acceptance of dedication at this time of any and all dedicated streets or ways*** . . . .

(Doc 250-Pgs 166-67, TR 1536-37, DX 13 at 4)(emphasis added) While Vicent stressed the "at this time" language (*Id.*), the government presented no evidence that Glynn County ever expressly accepted the dedication of "any and all dedicated streets or ways" of Satilla Shores.

## 4. <u>The county did not impliedly accept the offered dedication of these streets.</u>

The unrebutted evidence is that the County Commission expressly rejected the offer of dedication of the streets. That should be the final word. Even the district court noted that ". . . a governmental entity can impliedly accept a dedication (though perhaps not after an express rejection) . . . ." (Doc 257-Pgs 14-15 & n. 4) Considering the principles of

implied acceptance does not change the result as to the streets, even if there was an acceptance of elevation and drainage.

Georgia law permits a county to accept impliedly an offer of dedication by acts manifesting sufficient dominion and control. *See Kaplan v. City of Sandy Springs*, 286 Ga. 559, 560 (2010). "Where an owner of land makes an express offer of dedication of a particular portion of property for use by the public, the acceptance of that offer may be shown by any act of the municipality recognizing the existence of the public way and treating it as property of the [public entity]." *Teague v. City of Canton*, 267 Ga. 679, 681 (1997). "While working or maintaining the property by the legally constituted authority is the usual method of manifesting acceptance by the governmental entity, it is the government's exercise of dominion and control of the subject of the express offer of dedication which indicates acceptance of the dedication." *Id.*

Implied acceptance is a rigorous test, for a public authority can have *some* involvement with the property without the authority's having been deemed to impliedly accept the offer of dedication (and all

concomitant obligations). A discussion follows about what it takes for

implied acceptance.

> a. <u>Cases have found no implied acceptance where the public entity
> has had some involvement with a road or drainage improvement,
> but that involvement does not rise to dominion and control.</u>

Work that does not evidence dominion and control does not

amount to an implied acceptance by a governmental entity. It is not

enough for a road or drainage improvement to appear on a public

authority's map, for a public works director to make statements about

the need for work there, for the public entity to inspect the property and

require it to comply with regulations, for the public authority to do some

work on the site, or for some improvements to have been done at some

time (absent proof that the public authority actually made those

improvements).

*First,* in *Kaplan v. City of Sandy Springs*, 286 Ga. 559 (2010), the

Kaplans sought a mandamus to order public entities to repair a 36-inch

drainage pipe under their driveway and damages from the public

entities' failure to repair that pipe. The developer installed the drainage

pipe at the time of the construction of the Kaplans' subdivision in 1980,

and the pipe was part of a storm drainage easement described on the

final plat of the subdivision. *Id*. at 559-60. The final plat offered to "dedicate[] to the use of the public forever all streets, . . . drains, [and] easements . . . ." *Id*. at 560. The 36-inch pipe itself appeared on a revised final plat, which the county approved. *Id*. at 560-61.

The Georgia Supreme Court granted summary judgment for the county, finding both that there was no express or implied acceptance of the offer of dedication. As for the latter, "[a]cceptance of a dedication may be shown by any act of a governmental entity treating a structure as its own." *Id*. But any such act must "support an inference that the county exercised dominion and control over the drainage pipe." *Id*. The county had "investigated and photographed the pipe, cleared it of debris at the Kaplans' request on two occasions, and offered to reline the pipe in the Kaplans paid for materials." *Id*. These were not sufficient acts to show implied acceptance.

*Second*, in *Hibbs v. City of Riverdale*, 277 Ga. App. 889 (1997), a subdivision developer designed and built a drainage pond, which caused flooding. At issue was whether the city impliedly accepted responsibility for maintaining that system, which the developer had offered to dedicate to the city. *Id*. at 889. The Court found that the city had not

impliedly accepted the dedication to public use since nothing supported an inference that the city exercised dominion and control over the property. *Id*. This was true even though "the City certainly required [the developer] to build its drainage systems according to code and enforced those requirements with regular inspections." *Id*. Exercising regulatory power does not render a city responsible for maintaining a development. *Id*. The Court rejected a finding of implied acceptance despite the fact that

> Mr. Hibbs complained to the City's director of public works, who met with Mr. Hibbs and commissioned engineers to perform a study of the retention pond. The director of public works told Mr. Hibbs that he would make the problem "his number one priority," leading Hibbs to believe the City was responsible for the problem.

*Id*. at 890. The city's investigation did not reflect an exercise of dominion and control, and the acts and statements by the public works director, who had no authority to bind the city, did not estop the city. *Id*. at 891, *citing* O.C.G.A. §45-6-5.

*Third*, in *Rouse v. City of Atlanta*, 353 Ga. App. 542 (2020), the city contended that a sewage pipe constructed in the late 1800s had been dedicated to the city. The Court found that the city had not met its burden of showing dedication. *Id*. at 545. The Court also addressed the

city's claim that "it accepted a supposed offer to dedicate because it inspected the pipe in 2011 and added cementitious lining to the pipe." *Id*. The Court found that the "single inspection of the pipe in the pipe's 100-year existence is insufficient to show acceptance of the offer to dedicate." *Id*. As for the claim that the city added cementitious lining to the pipe, there was no evidence in the record to show that the city, as opposed to the property owner, added that lining. *Id*. at 546. And the city's "inclusion of the sewage pipe in its sewer system map is also insufficient to show dominion and control over the pipe to constitute an acceptance of the dedication offer." *Id*.

     b. <u>Cases finding implied acceptance show extensive involvement by a public authority.</u>

Georgia cases demonstrate the level of the public authority's involvement required to show an implied acceptance of an offer of dedication. These hallmarks include accepting fees, resolving problems with a sewage system when the developer does not, putting in writing that the county will accept all future maintenance after inspection, inspecting a road 50 to 60 times, and participating in the construction of the road itself.

*First,* in *Teague v. City of Canton*, 267 Ga. 679, 681 (1997), these facts demonstrated the city's "sufficient dominion and control" over a subdivision's sewer lines so as to constitute an implied acceptance:

- The city issued sewer tap-on permits to lot owners in the subdivision after the offer of dedication of the sewage system and before the developer quitclaimed only the streets to the city;

- The city processed the sewage the flowed through the disputed sewer lines, for which it charged lot owners a fee;

- The city told the developer that the subdivision's sewer system was substandard, meaning that it would not accept dedication of the system until all issues had been resolved. When the developer took no action to meet these standards, the city took action to resolve the sewer line problems.

- The city signed an agreement with a subdivision lot owner who had been denied a building permit in which the city agreed to continue to maintain the existing sewer system and to allow lot owners to use that system as long as each lot owner installed a septic tank for solid waste collection.

- The city informed all subdivision lot owners that they could use the system as long as they installed a septic tank to receive solid waste.

*Second,* in *Johnson & Harber Constr. Co. v. Bing,* 220 Ga. App. 179, 181 (1996), a factual issue on implied acceptance remained because the county required a developer to obtain a maintenance bond under the terms of a letter:

requiring Johnson & Harber to establish a two-year maintenance bond on construction of all streets, curbs, gutters and storm drainage structures in this subdivision. This letter stated that after inspection, "Henry County will accept all future maintenance of Moseley Crossing Subdivision. [If the subdivision] does not pass county inspection ... the County Department of Engineering & Roads ... will make the necessary repairs to bring the subdivision up to county standards. Upon the completion of necessary repairs the county will accept all future maintenance of [the subdivision]."

The express terms of this letter "*at the very least*" raised a fact issue about whether the county impliedly or expressly accepted dedication of the drainage system.

*Third,* in *Bryant v. Kern & Company, Inc.* 196 Ga. App. 165 (1990), the Court found that Gwinnett County impliedly accepted the dedication of a street. It "did more than simply approve the plat dedicating" the street. *Id.* at 167. Instead,

[i]t inspected the road on [50-60] occasions, requiring [the developer] to build the road to county standards; it required the posting of a maintenance bond; and, viewing the road as complete, it undertook the placement of traffic signs, ordering the erection of a stop sign at the intersection in question.

*Id.* at 167. When the auto accident at issue occurred, "it was incumbent on the county, not [the developers] to erect traffic control devices" on the street. *Id.*

41

*Finally,* the Georgia Supreme Court addressed implied acceptance in the context of road maintenance in *Ross v. Hall County Bd. of Commrs.,* 235 Ga. 309 (1975). Here is the level of activity that showed that acceptance:

> The plaintiffs show[ed] that the planning and health departments had approved the plans. They [also] presented the assistant county road supervisor who testified that pursuant to usual county practice, his supervisor had approved the grading and listed the subdivision roads on the county road book; the county had 'based' the roads to prepare them for blacktopping by the developer, and he, himself, had supervised the rebuilding of the blacktop after completion on two different occasions. Another county employee also testified that he had been in charge of a crew that worked the roads regularly in Mountain View Lake Estates, and that he had patched the roads several times. A former county commissioner, who had been on the board at the time, testified that the roads had been accepted after submission of the deed, that all three commissioners agreed to the start of the basing project and knew the roads were being based, that he had personally gone out to inspect the project several times, and that this was the usual procedure after a road dedication was accepted. . . .

*Ross*, 235 Ga. at 311-12. Repair and maintenance of dedicated roads by "authorized public officials out of tax funds" usually suffices to show implied acceptance. *Id*. at 312.

**5. The government's evidence does not demonstrate an implied acceptance of the offered dedication so as to support any finding that the county provided or administered those streets.**

McMichael introduced evidence showing an express rejection of the offered dedication of the streets. Even if the Court applies an implied acceptance test, the evidence does not show that, either.

a. The "PrivatePublicRoads2021" list (GX 104) does not reflect dominion, control, or administration, and the list is after the relevant date of February 23, 2020.

Despite a 2021 list that deemed Satilla, Burford, and Holmes as public streets and Vicent's statements that these roads were public, that list and those statements could not countermand the County Commission's rejection and show implied acceptance in 2020. *See Hibbs v. City of Riverdale*, 277 Ga. App. 889, 890 (1997)(finding that statements by director of public works that he would make a drainage issue his "number one priority" did not bind the city or make the subdivision's drainage system a city system); *see also* O.C.G.A. §45-6-5 (cabining powers of public officers to those "defined by law," and stating that the "public may not be estopped by the acts of any officer done in the exercise of an unconferred power"); *cf. Maschmeier v. Scott*, 269 Fed. Appx. 941, 943 (11th Cir. 2008)(observing that in 42 U.S.C. §1983

43

actions, local governmental liability "may be premised on a single illegal act by a government officer [but] only when the challenged act may fairly be said to represent official policy, such as when that municipal officer possess final policymaking authority over the relevant subject matter").

Placement on the list was not enough. *See Rouse*, 353 Ga. App. at 546 (stating that city's "inclusion of the sewage pipe in its sewer system map is. . .insufficient to show dominion and control over the pipe to constitute an acceptance of the dedication offer"); *Merlino v. City of Atlanta*, 283 Ga. 186, 188-89 (2008)(observing that despite inclusion of sewer pipe on a city "Storm Drainage Inventory," city did not exercise dominion and control over it); *cf. Ross*, 235 Ga. at 311-12 (noting, as one factor of many, that supervisor placed the road on county road book after approving the grading and county "based" the roads to prepare them for blacktopping by the developer).

    b. <u>The service tickets (GX 105) do not reflect dominion, control, or administration over the roads; they show instead an acceptance, whether express or implied, of maintenance for the drainage system.</u>

The service tickets (GX105) show the County's express or implied acceptance of the duty to maintain elevation and drainage. It does not

show any implied acceptance of that duty as to streets, which is what the indictment charged. (Doc 1-Pg 1) Streets differ from rights-of-way, which include the streets *and* the surrounding shoulders and easements. (Doc 250-Pgs 163-64, TR 1533-34) To broaden the analysis now to "right of way" would amount to a constructive amendment of the indictment. *See United States v. Madden*, 733 F.3d 1313, 1314 (11th Cir. 2013)(defining constructive amendment).

*Second*, while the county expressly rejected the offered dedication of the *streets* of Satilla Shores, it accepted the "elevation and drainage of the area involved." (GX13) A county can accept part of a dedication and reject another part. *See Teague*, 267 Ga. at 680-81 (noting that county expressly accepted offer of dedication as to streets but expressly declined dedication of water and sewer system). If this does not constitute an express acceptance of "elevation and drainage," the County's treatment of drainage and ditches in Satilla Shores shows its implied acceptance. Indeed, 70% of the service tickets on their face concern ditches, mosquitos, drainage, and cross-drains

.

c. The largely undated and often incomplete documents in GX 106 do not show the county's dominion over, or control or administration of, the Satilla Shores neighborhood streets on February 23, 2020.

McMichael again relies on his factual recitation. Briefly, these often undated and incomplete minutes show that the County refused to put up streetlights in Satilla Shores, approved Georgia Power's doing work in the right-of-way, accepted a bid for work on seven streets (including two from Satilla Shores) that included "draining," and executed documents about LARP.[15] Vicent did not know whether any work had actually been done on anything mentioned in the County Commission minutes. (Doc 265-Pgs 184-89, TR 1554-59) Vicent, who recalled no specific work at Satilla Shores, could offer only that the roads were "paved now." (Doc 265-Pg 167, 187, TR 1537, 1557)

The district court found that it did "not matter that there was no direct evidence of whether any work actually occurred" because "this work was called for an contemplated" and "the streets of Satilla Shores were in working order." (Doc 257-Pg 14) But it *does* matter.

---

[15] Vicent did not know what LARP was; he testified only that "I'm sure that it's an acronym that could have changed over the years." (Doc 265-Pg 186, TR 1556)

The government relied on an offer of dedication of the streets in the plat in an attempt to demonstrate "provide" or "administer." The County Commission rejected it. The rejection may very well end the issue. But if the Court considers whether implied acceptance occurred, a county's acts must be substantial. They were not with respect to the streets. Like the sewage pipe in *Rouse*, the fact that the road was "paved," absent showing who paid to pave it, was not enough. The only evidence here was that the developer paved the streets. (Doc 250-Pg 164, TR 1534)

Finally, the government adduced no evidence about the composition of the streets (whether concrete, asphalt, or other product) or how long neighborhood streets typically last. These things are not within the common knowledge or experiences of jurors. While the district court believed that the jury could reasonably infer that the County paved the streets from the "direct evidence that this work was called for and contemplated" (Doc 257-Pg 14),  a "conviction must be supported by reasonable inferences, not mere speculation." *United States v. Rodriguez,* 732 F.3d 1299, 1303 (11th Cir. 2013). "In giving effect to such inferences as may be reasonably drawn from the evidence

juries properly apply their common knowledge, observations, and experience in the affairs of life." *United States v. Cruz-Valdez,* 773 F.3d 1541, 1546 (11th Cir. 1985)(en banc). The Court "frequently take[s] into account matters of common sense or general knowledge," because "[w]hat everybody knows the court must know." *Id.* at 1546-47.

   d. <u>What people say on Facebook is not the law.</u>

   The district court also relied on government's exhibit 67, which it described as a "Facebook posting of homeowners in the neighborhood discussing trying to privatize the neighborhood, suggesting that the streets were open to the public up to that point." (Doc 257-Pg 14) The posting did much more than that description allows, as will be discussed in the evidentiary challenge to this Facebook post.

   Neighbors saying on Facebook that a road is public does not make a road public. It has nothing to do with whether the County accepted the obligation of maintaining the roads. It offered legal advice that the unidentified neighbors were not competent to give. And if – under Georgia case and statutory law – Vicent cannot bind the County by declaring a street public, people expressing opinions on a Facebook page certainly cannot, either. Besides, there were four neighbors who

testified as witnesses in this trial – Matt Albenze, Dan Alcott, Kim Ballesteros, and Evelyn Cofer – and the government asked none of them about the streets.

### 6.  **The government did not prove that Glynn County "provided or administered" the Satilla Shores streets.**

Insufficient evidence supports a finding that Glynn County "provided or administered" the streets of Satilla Shores. Relying on the parade cases, both of which discussed "administered," the district court concluded

> [R]egardless of whether the local government *owns* the particular facility, if it supplies the resources or oversees the tasks necessary for the public to use it, then the facility is "provided or administered" by that government.

(Doc 257-Pg 11) Even accepting the district court's definition that "provide" means (for instance) "supply for use" (Doc 257-Pg 9), the evidence was that the neighborhood developer provided the streets when he supplied them for use. As in the parade cases (*White* and *Griffin*), the real issue is whether the County administered them.

*White* discussed the legislative history of §245, which "showed that [r]acially motivated violence during parades, marches, and demonstrations was precisely what this act was designed to address."

*White*, 846 F.2d at 695. This was part of the statute's "broad remedial purpose." *Id*. Griffin noted §245's legislative history relative to roads, that is, "that a sponsor of the bill in the Senate 'stated clearly that this act was designed to protect someone travelling on an *interstate highway*." *Griffin*, 585 F. Supp. at 1446 & n. 1 & 2 (emphasis added).

But this case did not occur on a federal interstate, a state highway, or an inarguably city street. Those are the types of roads underlying cases that have been prosecuted under §245. *See, e.g., United States v. Cazares*, 788 F.3d 956, 990 (9th Cir. 2015)("in and around Avenue 52" in Los Angeles); *United States v. Sandstrom*, 594 F.3d 634, 641 (8th Cir. 2010)("in the middle of 9th Street" in Kansas City, Missouri); *United States v. Nelson*, 277 F.3d 164, 193 (2d Cir. 2002)("President Street in Brooklyn"); *cf. United States v. Allen*, 341 F.3d 870, 876 (9th Cir. 2003)(public park); *United States v. Franklin*, 704 F.2d 1183 (10th Cir. 1983)(same); *United States v. Bledsoe*, 728 F.2d 1094, 1095 (8th Cir. 1984)(same). The conduct here occurred instead in a small neighborhood on streets over which the undisputed evidence is the County Commission expressly rejected dedication. Federal jurisdiction is not limitless.

Consider, too, the Supreme Court's plain-meaning discussion in *Wooden v. United States*, ___ U.S. ___, 142 S. Ct. 1063 (2022), which considered whether Wooden's ten burglaries in a single storage facility in one evening were "committed on occasions different from one another" as required by the Armed Career Criminal Act. Wooden argued that this was a single episode (same location, same roof, same night), while the government countered that "every time Wooden busted into another storage unit, he commenced a new 'occasion.'" *Id*. at 1068. In rejecting the government's argument, the Court considered the "ordinary meaning of the word 'occasion' – essentially an episode or event," and asked first "how an ordinary person (a reporter; a police officer; yes, even a lawyer) might describe Wooden's ten burglaries – and how she would not." *Id*. at 1069.

So consider how an ordinary person – yes, even a lawyer – would describe "administer."  The statute applies where a state or subdivision "administers" "any benefit, service, privilege, program, facility or activity." 18 U.S.C. §245(b)(1)(B). Things like benefits, services, and programs are a more natural fit for "administer" than are streets. *See, e.g., Griffin*, 585 F. Supp. at 1446 (finding "that a parade for which a

permit is issued by a city, and for which routine monitoring by the

police was planned, is an activity 'administered' by that city"). It is

telling, for instance, that neither the government nor Vicent used

"administer" at any point to describe what the DPW does.

Regardless of the word used (whether provide or administer), the

government's evidence proved neither as to the streets.

**Issue two: The district court abused its discretion, and committed plain error, when it admitted into evidence government's exhibit 67, a Facebook thread between anonymous Satilla Shores neighbors that offered a legal opinion that the streets were public and conveyed advice about how to privatize the neighborhood streets.**

Through Amy Vaughn, an FBI intelligence analyst for the FBI's

Counterterrorism Division, the government offered a series of exhibits,

including government's exhibit 67. The Court initially admitted them

without opposition from defense counsel. (Doc 249-Pgs 18-19, TR 1388-

39) When the government displayed exhibit 67, a May 15, 2020,

Facebook thread from the Satilla Shores Homeowners group,

McMichael objected in the following exchange:

> [Defense]: Your Honor, I am sorry. I should have objected to this
> post, and I am sorry that I did not catch this earlier. This post is
> asking someone to give a legal opinion and there has been no
> qualification that the person making the legal opinion is, in fact,
> an attorney.

*****

[Government]: Your Honor, we're not offering this as someone's legal opinion. We're offering this as the individuals in the neighborhood seeking to privatize their streets. It's relevant what the individuals in the neighborhood knew and believed about these streets.

[Defense]: You Honor, what the neighbors believe about the streets, though, isn't the issue. There's a whole set of other issues related to whether it's a private or public street.

[The Court]: I am going to overrule the objection, but the jury will keep in mind that at the end of the case I'm going to give you the law that you will apply in making your decision and it is my instructions that will govern your interpretation of the law and no one else's.

(Doc 249-Pg 34, TR 1404) The obvious objection – one that counsel is even sorrier that she did not catch earlier – is that the Facebook post was at least hearsay and often double hearsay.

Vaugh highlighted the following from the Facebook thread:

- "We are looking to privatize our streets. . . ."

- "You first have to purchase the roads from the County since they are county-maintained and then you can put up a gate. I already been told this."

- "There are a couple of ways you can change from a public road to a private road. It would take all homeowners/landowners in the . . . subdivision to be in agreement to form a homeowners association. There is a benefit to that. Most property values increase when an HOA exists. An attorney could put it together for you, then work with the county ordinances which would

53

> require a legal agreement that the County would abandon the
> property, or there are other ways, such [as] a legal agreement
> with the County to allow the residents' use of the right-of-way
> to do something like put up entry gates to the community, but
> you would still need an attorney's assistance to give access to
> 911/EMS, trash service, et cetera. Anything is possible."

(Doc 249-Pgs 35-36, TR 1405-06) The government used this post in its

opposition to McMichael's motion for judgment of acquittal (Doc 233-Pg

5), and the district court cited to it, too, in the order denying that

motion. (Doc 257-Pg 14)

The admission of this post constituted both an abuse of discretion

as to the preserved objection and plain error as to the unpreserved.

First, it is hearsay.  The federal evidence rules "generally preclude all

parties from introducing unreliable, out-of-court statements for the

truth of the matter asserted." *Hemphill v. New* York, ___ U.S. ___, 142

S. Ct. 681, 693 (2022). The government explicitly offered the Facebook

post to show that "the individuals in the neighborhood sought to

privatize their streets," and the first post it asked Vaughn to read was

"We are looking to privatize our streets." (Doc 249-Pg 34-35, TR 1404-

05) The government thus sought its admission to prove the truth of the

matter asserted. This is error that is plain under binding precedent. *See generally United States v. King*, 57 F.4th 1334, 1340-41 (11th Cir. 2023).

What the individuals "knew and believed about those streets" contained another level of hearsay: They relayed advice that they received from others, e.g., "I already been told this." These posts expressed legal opinions from unknown people on how to make public roads private: purchasing roads from the county, forming a homeowners' association, getting the county to abandon the road, placing gates on the property. Legal opinions come from lawyers. *Cf. United States v. Schiffman*, 552. F.2d 1124, 1125 (5th Cir. 1997) (addressing unpreserved challenge to hearsay legal opinion of a lawyer and affirming on harmlessness). The district court informed the jury that it would instruct on the law, but it did not address this specific issue. Its instructions told the jury that the government had to prove that the public streets were "provided or administered by Glynn County, Georgia." (Doc 252-Pg 157, TR 1989)

The Facebook post is the only evidence about the neighbors' expressions about privatization, a legal process to privatize roads, homeowner's association, and the neighbors' needing to pay for roads if

they were privatized. The government asked none of the four neighbor-witnesses (Matt Albenze, Dan Alcott, Kim Ballesteros, and Evelyn Cofer), all of whom were available for cross-examination, about the Satilla Shores streets. Admission of this evidence was harmful error (to the extent the objection was preserved) and plain error (to the extent that it was not): The post did not duplicate other evidence, it informed the jury of entirely new information not otherwise raised by the government, and the district court relied on it in denying McMichael's motion for judgment of acquittal. To the extent that it was plain error, the Court should exercise its discretion and correct the evidentiary error: It was clearly impermissible hearsay used to make a point that the government did not explore with live witnesses.

**Issue three: The district court abused its discretion when it admitted the NICB affidavit to prove the instrumentality prong of the attempted kidnapping charge.**

The attempted kidnaping count identified only the "truck driven by **TRAVIS McMICHAEL**" as an instrumentality of interstate commerce (Doc 1-Pg 4), which is an essential element under 18 U.S.C. §1201(a)(1) and (d). The government called FBI staff operations specialist Maria Pagan to testify in this regard. (Doc 250-Pgs 190-91,

TR 1560-61) Before Pagan's substantive testimony began, McMichael objected that the government sought to introduce an affidavit from the National Insurance Crime Bureau ("NICB") that did not meet the either business records exception to the hearsay rule or the certification requirement of Fed. R. Evid. 902(11); McMichel, too, argued that the defendants had "never seen the underlying business records at all" because they had not been produced in discovery. (Doc 250-Pgs 192-93, TR 1562-63) The government called this description inaccurate and replied that the "affidavit serves as the business record in that that's what they pulled from their computers." (*Id*.) The district court "noted" the objection. (*Id*.)

Pagan then testified that she learned that Bryan's truck had been manufactured in Mexico and that McMichael's truck had been manufactured in "North America," which the government then characterized as the "United States." (Doc 250-Pg 196, TR 1566) When the government prepared to introduce the NICB affidavit, Bryan's attorney objected on that it was not a business record affidavit; counsel for both McMichaels joined in, and McMichael argued again that it did not meet the self-authenticating requirements of Fed. R. Evid. 902(11).

(Doc 250-Pgs 198-99, TR 1568-69) The district court sustained the objection. (Doc 250-Pg 200, TR 1570) When the government nonetheless tried to get in the affidavit's contents through Pagan's testimony, Greg McMichael objected, and the government asked that its witness be permitted to step down subject to recall. (Doc 250-Pg 201, TR 1571)

The next morning, McMichael objected to a second iteration of the affidavit (it wasn't a business record), and the government said it could "amend" the exhibit. (Doc 251-Pgs 38-39, TR 1691-92) The government then recalled Pagan. (Doc 251-Pg 88, TR 1741) Pagan repeated her statement that she used the VIN to determine the vehicles' manufacturing site, and based on McMichael's objection, clarified how she knew that information. (Doc 251-Pg 89, TR 1742) Pagan replied, "I just did an open source search in Google, and Google will tell you that. . .the first digit means the country of origin." (Doc 251-Pg 90, TR 1743) McMichael successfully objected. (*Id*.) The government moved for admission of another affidavit, this time with certification dated for Wednesday, February 23, 2022 – five days after Pagan's second day of testimony. (Doc 251-Pg 92, TR 1745, GX128) With respect to the affidavit regarding his truck, Bryan objected based on the date (*Id*.); the

McMichaels objected that the affidavit did not contain business records and appeared merely to reflect a search. (Doc 251-Pgs 93-94, TR 1746-47, GX129) The district court provisionally admitted both affidavits. (*Id.*) Pagan then testified from the affidavit that the McMichaels' truck was manufactured in Missouri and shipped to Kingsland, Georgia. (Doc 251-Pg 94, TR 1747)

At a later sidebar, the district court confirmed that besides Pagan, the affidavits were the only basis for the interstate commerce nexus on the kidnaping charge. (Doc 251-Pg 112, TR 1765) The government confirmed that it did not allege that guns were instrumentalities of interstate commerce and described the affidavits as "gravy exhibits" and "bonus exhibits" to meet the interstate commerce prong:

> Ms. Copeland presented . . . *Ballenger* in the Eleventh Circuit – [which] gives a vehicle as an example of instrumentality of the interstate commerce . . . .

(Doc 251-Pg 113, TR 1766)[16] The district court called it "sloppy." (*Id.*) After further consideration of the affidavits, the district court believed the date discrepancy to be a scrivener's error and refused to let the

---

[16] As will be discussed later, the case was *Garcia*.

government "to keep correcting it in front of the jury" because it "is simply not fair to the process." (Doc 251-Pg 119, TR 1772)

The district court abused its discretion when it admitted the post-dated affidavit and allowed Pagan to testify about its contents. *Cf. Corner Pocket of Sioux Falls, Inc. v. Video Lottery Technologies, Inc.*, 123 F.3d 1107, 1113 (8th Cir. 1997)(rejecting consideration of affidavit on procedural grounds where neither affiant nor substance of his testimony was disclosed in discovery and every verifiable detail of affidavit, like error as to date of a conversation, was incorrect). After the government had two chances to submit a proper affidavit, it submitted with a date five days in the future affirming that the information was correct. Absent the affidavit, the only evidence was that McMichael's truck was manufactured in North America (the United States), which the non-expert witness learned from a Google search.

**Issue four: The government did not prove beyond a reasonable doubt that McMichael used an instrumentality of interstate commerce in committing the attempted kidnaping charge.**

The jury convicted McMichael of count three of the indictment, which charged him with an unlawful attempt to seize and confine

Arbery by using an instrumentality of interstate commerce, namely a

truck. (Doc 1-Pg 4) The statute itself applies to

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps,
> abducts, or carries away and holds for ransom or reward or
> otherwise any person, . . . when . . . the offender . . . uses . . . any .
> . . instrumentality of interstate. . .commerce in committing or in
> furtherance of the commission of the offense . . . .

18 U.S.C. §1201(a)(1); *see also* 18 U.S.C. §1201(d)(applying statutory

coverage to attempts to kidnap).

McMichael argued that insufficient evidence supported his

kidnaping conviction because the government did not prove that his

truck was an instrumentality of interstate commerce or that the truck

was being used as an instrumentality of interstate commerce during the

commission of a crime. (Doc 228-Pgs 33-39) The district court rejected

these arguments, finding that purely intrastate use of an automobile

sufficed and that there was "no serious argument that the jury could

not find that the McMichaels used the trucks as trucks to facilitate the

kidnapping. . . ." (Doc 257-Pgs 24-26)

### 1. **The government did not prove that the Ford pick-up truck was an instrumentality of interstate commerce.**

McMichael relies on his argument about why the district court abused its discretion in admitting the NICB affidavit and how, absent that admission, there was no proof of an interstate nexus in the manufacture and delivery of the truck.[17]

### 2. **The government did not prove that the truck was being used as an instrumentality of interstate commerce in the commission of a crime.**

The conduct in this case took place solely in a small neighborhood off a state highway. Travis McMichael's Ford pick-truck was parked in the family's driveway until his father summoned him out. Both McMichaels followed Arbery through the subdivision at a low speed, and the non-moving truck itself, with no one behind the wheel – along with the one driven by Bryan – was used to attempt to confine Arbery.

"Congress is empowered to regulate and protect the instrumentalities of interstate commerce . . . even though the threat may come only from intrastate activities." *United States v. Lopez*, 514

---

[17] That affidavit showed that the truck was manufactured in Missouri and sold in Georgia, with a shipping date of August 19, 2019. (GX129)

U.S. 549, 558 (1995); *accord United States v. Ballinger*, 395 F.3d 1218, 1225 (11th Cir. 2005)(en banc)(discussing reach of *Lopez* in 18 U.S.C. §247 case where defendant traveled between states to burn churches). Instrumentalities of interstate commerce are "the people and things themselves *moving* in commerce, including automobiles, airplanes, boats, and shipment of goods." *Ballinger*, 395 F.3d at 1226 (emphasis added). "Plainly, congressional power to regulate the channels and instrumentalities of commerce includes the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature." *Id*.

But *Ballinger* "arguably suggests, without explicitly stating, that persons and things moving in interstate commerce is the full extent of the instrumentalities category." *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1249 (11th Cir. 2008)(declining to sustain Graves Amendment, which shields car rental and leasing firms from vicarious liability for injuries by car renters, as a valid regulation of instrumentalities of interstate commerce). Despite the findings of other courts that cars are *per se* instrumentalities, the Eleventh Circuit has declined to go that far: It expressed concern that if a car's status as an

instrumentality alone were sufficient to support the exercise of commerce power, there would be no limit to the types of automobile use that Congress could regulate. *Id*. at 1250. Indeed, the Court noted its suspicion of "the premise that all methods of transportation and communication are per se instrumentalities of commerce even when they are not used in commerce." *Id*.; *cf. United States v. Bishop*, 66 F.3d 469, 597-600 (3d Cir. 1995)(Becker, J., dissenting)(observing that "automobiles can indeed be used to engage in interstate commerce (and an automobile need not be travelling interstate to be used in interstate commerce), but the federal carjacking statute "in no way regulates instrumentalities in any way engaged in interstate commerce," meaning that it lacks the requisite nexus under *Lopez*). *Garcia* thus suggests that an automobile is not a *per se* instrumentality.

McMichael's truck was not an instrumentality of interstate commerce "in committing or in furtherance of the commission of" attempted kidnapping. The truck's use as a barricade to attempt to "corral and detain" Arbery renders it outside §1201's ambit. The Sixth Circuit considered an "*atypical* application of the Federal Kidnapping Statute" in *United States v. Small*, 988 F.3d 241, 248 (6th Cir. 2021)

64

(emphasis added). There, the government's evidence was that the
defendants traveled in a rental car from West Virginia to Tennessee;
pulled into the victim's driveway in Tennessee the next day and
committed the crime; "escaped in their car"; and traveled back to West
Virginia. *Id.* at 251. A reasonable juror could conclude that the
interstate commerce element was met because the defendants used the
car to cross state lines, travel to the victim's home, and then escape. *Id.*
The "frequent use of the rental car was not 'casual and incidental' to the
kidnapping, but an important tool for the conspirators to effectuate
their activities." *Id.* at 252. In *Small*, the rental car was necessary to
cross state lines, get to the site of the kidnapping, and escape the scene
of the crime, yet the Sixth Circuit called this conduct "atypical."

The Ford truck was not moving in interstate commerce. Its use as
a putative means of corralling or detaining Arbery came from the fact
that it was *parked*, with McMichael standing outside. This would be
akin to finding an interstate commerce nexus if a person used the
receiver of a rotary dial telephone to bludgeon someone or its wire cord
to garrote a victim. *Cf. Perez v. New Auto Image Mkg., Inc.*, 2016 WL
7540272 (S.D. Fla. May 20, 2016)(analyzing FLSA 's "engaged in

commerce" standard, which requires direct participation of movement of things in interstate commerce, finding that plaintiff was not directly involved in interstate commerce where he repaired cars that were damaged in transport or on a dealer's lot, and citing similar results in cases where people washed or detailed cars that had been transported in interstate commerce).

## CONCLUSION

Appellant Travis McMichael respectfully asks the Court to reverse his convictions.

Respectfully submitted this 3rd day of March, 2023.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

This 3rd day of March, 2023.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

## CERTIFICATE OF SERVICE

I served a copy of this Brief of Appellant on counsel for the government by filing it on the Court's EC/CMF portal, which emails to all counsel of record a link to a file-stamped .pdf copy of the brief.

This 3rd day of March, 2023.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

602 Montgomery Street
Savannah, Georgia 31401
912-807-5000
ALC@roco.pro