IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

WILLIAM BRYAN, *et al.*,

Defendants-Appellants

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

———————————

BRIEF FOR THE UNITED STATES AS APPELLEE

———————————

JILL E. STEINBERG
  United States Attorney

TARA M. LYONS
First Assistant United States Attorney

KRISTEN CLARKE
  Assistant Attorney General

ERIN H. FLYNN
BRANT S. LEVINE
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 616-4373
  Brant.Levine@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the

United States as appellee certifies that, in addition to those identified in the

briefs filed by appellants, the following person may have an interest in the

outcome of this case:

Clarke, Kristen, U.S. Department of Justice, Civil Rights Division,

counsel for the United States.

The United States certifies that no publicly traded company or corporation

has an interest in the outcome of this appeal.

s/ Brant S. Levine

BRANT S. LEVINE
   Attorney

## STATEMENT REGARDING ORAL ARGUMENT

Given the issues presented on appeal, the United States agrees that oral argument would be appropriate and requests 15 minutes per side.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ...........................................C-1

STATEMENT REGARDING ORAL ARGUMENT

STATEMENT OF JURISDICTION...........................................................................1

STATEMENT OF THE ISSUES...............................................................................2

STATEMENT OF THE CASE...................................................................................3

      1.     *Factual Background* ............................................................. 4

           a.     *How Defendants Pursued And Killed Arbery* ............................. 4

           b.     *Why Defendants Pursued And Killed Arbery* ............................. 9

           c.     *Where Defendants Pursued And Killed Arbery* ....................... 13

      2.     *Procedural History* ............................................................. 14

      3.     *Standards Of Review On Appeal* ....................................... 15

SUMMARY OF THE ARGUMENT ......................................................17

ARGUMENT

     I     THE JURY REASONABLY CONVICTED DEFENDANTS
          OF A HATE CRIME...........................................................19

           A.     *The Jury Reasonably Concluded That Defendants
                Pursued Arbery Because He Was Black* ...................................22

           B.     *The Jury Reasonably Concluded That Defendants
                Pursued Arbery Because Of His Use Of A Public Street*..........29

C.      *The Jury Reasonably Concluded That Defendants Pursued Arbery On Streets Provided Or Administered By Glynn County* ......................................................................34

D.      *Travis McMichael's Evidentiary Challenge Does Not Justify Reversal* .........................................................................40

II      THE JURY REASONABLY CONVICTED DEFENDANTS OF ATTEMPTED KIDNAPPING .......................................................42

A.      *The Jury Reasonably Concluded That Defendants Attempted to Kidnap Arbery For A Benefit* .............................43

B.      *The Jury Reasonably Concluded That Defendants Attempted To Kidnap Arbery Using Instrumentalities Of Interstate Commerce* ...........................................................49

         1.      *The Kidnapping Statute Is Satisfied By An Intrastate Use Of An Instrumentality Of Interstate Commerce* ......................................................49

         2.      *Defendants Used Instrumentalities Of Interstate Commerce—Their Trucks—To Commit The Crime* ................................................................52

C.      *Travis McMichael's Evidentiary Challenge Does Not Warrant Reversal* ....................................................................54

CONCLUSION .................................................................................57

CERTIFICATE OF COMPLIANCE

# TABLE OF CITATIONS

**CASES:**                                                                                    **PAGE**

*Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731 (2020)............................................ 24, 30

*Brooks* v. *United States*, 199 F.2d 336 (4th Cir. 1952) ...........................................45

*Burrage* v. *United States*, 571 U.S. 204 (2014)...................................................... 23-24

*Food Mktg. Inst.* v. *Argus Leader Media*, 139 S. Ct. 2356 (2019).........................36

*Garcia* v. *Vanguard Car Rental USA, Inc.*, 540 F.3d 1242 (11th Cir. 2008),
    cert. denied, 555 U.S. 1174 (2009)..................................................................52

*Gooch* v. *United States*, 297 U.S. 124 (1936)...........................................................44

*Huddleston* v. *United States*, 485 U.S. 681 (1988)...................................................33

*Johnson* v. *Mississippi*, 421 U.S. 213 (1975) ...........................................................21

*Morris* v. *Sumter Cnty.*, 365 Ga. App. 323, 878 S.E.2d 81 (2022),
    reconsideration denied (Sept. 15, 2022) ........................................................40

*Rosemond* v. *United States*, 572 U.S. 65 (2014) ......................................................48

*Rotkiske* v. *Klemm*, 140 S. Ct. 355 (2019)...............................................................36

*United States* v. *Adams*, 83 F.3d 1371 (11th Cir.),
    cert. denied, 519 U.S. 973 (1996)...................................................................42

*United States* v. *Allen*, 341 F.3d 870 (9th Cir. 2003),
    cert. denied, 541 U.S. 975 (2004)...................................................................21

*United States* v. *Ballinger*, 395 F.3d 1218 (11th Cir.) (en banc),
    cert. denied, 546 U.S. 829 (2005)............................................................ 50, 52

*United States* v. *Benjamin*, 958 F.3d 1124 (11th Cir.),
    cert. denied, 141 S. Ct. 561 (2020)....................................................... 23, 30-31

**CASES (continued):** PAGE

*United States* v. *Campbell*, 223 F.3d 1286 (11th Cir. 2000),
cert. denied, 534 U.S. 829 (2001)...................................................... 17, 40-41

*United States* v. *Carrasquillo*, 4 F.4th 1265 (11th Cir. 2021)...............................55

*United States* v. *Cazares*, 788 F.3d 956 (9th Cir. 2015),
cert. denied, 579 U.S. 919 (2016)...................................................................35

*United States* v. *Childress*, 26 F.3d 498 (4th Cir. 1994) ......................................45

*United States* v. *Cooper*, 203 F.3d 1279 (11th Cir. 2000).....................................44

*United States* v. *Crabtree*, 878 F.3d 1274 (11th Cir. 2018) ...................... 16, 40, 54

*United States* v. *Davis*, 61 F.3d 291 (5th Cir. 1995) .............................................44

*United States* v. *Duncan*, 855 F.2d 1528 (11th Cir. 1988) ....................................45

*United States* v. *Dunnaway*, 88 F.3d 617 (8th Cir. 1996) .....................................27

*United States* v. *Ebens*, 800 F.2d 1422 (6th Cir. 1986),
abrogated on other grounds by
*Huddleston* v. *United States*, 485 U.S. 681 (1988) .......................................33

*United States* v. *Evans*, 476 F.3d 1176 (11th Cir.),
cert. denied, 552 U.S. 878 (2007)...................................................................50

*United States* v. *Feldman*, 936 F.3d 1288 (11th Cir. 2019)............................. 24, 30

*United States* v. *Frazier*, 387 F.3d 1244 (11th Cir. 2004) (en banc),
cert. denied, 544 U.S. 1063 (2005).................................................. 16, 54, 56

*United States* v. *Fries*, 725 F.3d 1286 (11th Cir. 2013) ........................... 16, 35, 44

*United States* v. *Furrow*, 125 F. Supp. 2d 1178 (C.D. Cal. 2000) ........................21

*United States* v. *Greer*, 440 F.3d 1267 (11th Cir. 2006) ........................... 16, 35, 44

**CASES (continued):** **PAGE**

*United States* v. *Jiminez*, 564 F.3d 1280 (11th Cir. 2009)......................................41

*United States* v. *Lewis*, 40 F.4th 1229 (11th Cir. 2022) ................................. 41, 56

*United States* v. *Lewis*, 115 F.3d 1531 (11th Cir. 1997) ......................................45

*United States* v. *Lopez*, 514 U.S. 549 (1995)...........................................................50

*United States* v. *McKinley*, 647 F. App'x 957 (11th Cir.),
    cert. denied, 137 S. Ct. 513 (2016)................................................................50

*United States* v. *Melton*, 883 F.2d 336 (5th Cir. 1989) ......................................46

*United States* v. *Miers*, 686 F. App'x 838 (11th Cir. 2017) ................................45

*United States* v. *Mungia*, 114 F.3d 1181 (5th Cir.),
    cert. denied, 522 U.S. 876 (1997)................................................................35

*United States* v. *Nelson*, 277 F.3d 164 (2d Cir.),
    cert. denied, 537 U.S. 835 (2002)........................................................ 33-35

*United States* v. *Parker*, 103 F.2d 857 (3d Cir. 1939)..........................................45

*United States* v. *Price*, 464 F.2d 1217 (8th Cir. 1972) ..........................................32

*United States* v. *Protho*, 41 F.4th 812 (7th Cir.),
    cert. denied, 143 S. Ct. 465 (2022)................................................. 49, 51, 56

*United States* v. *Reeves*, 742 F.3d 487 (11th Cir. 2014)............................. 15-16, 23

*United States* v. *Roberts*, 308 F.3d 1147 (11th Cir. 2002),
    cert. denied, 538 U.S. 1064 (2003)................................................................55

*United States* v. *Rodgers*, 466 U.S. 475 (1984)......................................................37

*United States* v. *Rodriguez*, 732 F.3d 1299 (11th Cir. 2013) ......................... 16, 32

*United States* v. *Roosevelt Coats*, 8 F.4th 1228 (11th Cir. 2021)............................48

**CASES (continued):**                                                    **PAGE**

*United States* v. *Salinas*, 918 F.3d 463 (5th Cir. 2019) ............................................24

*United States* v. *Snyder*, 471 F. App'x 884 (11th Cir.),
    cert. denied, 568 U.S. 956 (2012) ..................................................................55

*United States* v. *White*, 846 F.2d 678 (11th Cir.),
    cert. denied, 488 U.S. 984 (1988) ........................................ *passim*

*United States* v. *Windham*, 53 F.4th 1006 (6th Cir. 2022) ......................................51

**STATUTES:**

18 U.S.C. 245(b)(2)(B) ..................................................................... *passim*

18 U.S.C. 924(c) ...........................................................................4, 14

18 U.S.C. 1201(a) ...............................................................................44

18 U.S.C. 1201(a)(1)................................................................... *passim*

18 U.S.C. 1201(d) ............................................................... 14, 19, 42

18 U.S.C. 3231 .....................................................................................1

28 U.S.C. 1291 .....................................................................................2

Ga. Code Ann. § 32-1-3(24) (West 2023) ................................................39

**RULE:**

Fed. R. Evid. 801(c) .............................................................................41

**LEGISLATIVE HISTORY:**

S. Rep. No. 721, 90th Cong., 2d Sess. (1967) .........................................33

114 Cong. Rec. 1029 (1968) .....................................................................37

**MISCELLANEOUS:** PAGE

Webster's Third New International Dictionary (3d ed.1968)..................................36

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

Nos. 22-12792, 22-12793, 22-12794

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

WILLIAM BRYAN, *et al.*,

Defendants-Appellants

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

_____

BRIEF FOR THE UNITED STATES AS APPELLEE

_____

**STATEMENT OF JURISDICTION**

This appeal is from a district court's final judgment in three criminal cases.

The district court had jurisdiction under 18 U.S.C. 3231. The court entered final

judgment against William Bryan, Gregory McMichael, and Travis McMichael on

August 18, 2022. Docs. 263-265, 298. Defendants timely filed notices of appeal:

Bryan on August 18, 2022; Gregory McMichael on August 21, 2022; and Travis

McMichael on August 22, 2022.  Docs. 266, 271-272.  This Court has jurisdiction under 28 U.S.C. 1291.[1]

## STATEMENT OF THE ISSUES

Defendants are three white men who killed Ahmaud Arbery, a Black man who was running on the streets in defendants' neighborhood.  A federal jury convicted defendants of several felonies related to Arbery's death, including a hate crime and attempted kidnapping.  In these appeals, defendants no longer contest that they used force or threat of force to injure and intimidate Arbery, and they likewise do not dispute that they attempted to unlawfully seize or confine Arbery.  The remaining issues on appeal are:

1.  Whether the jury reasonably convicted defendants of a hate crime under 18 U.S.C. 245(b)(2)(B) by finding beyond a reasonable doubt that defendants acted because of Arbery's race and because Arbery was using a public street.

2.  Whether the jury reasonably convicted defendants of attempted kidnapping under 18 U.S.C. 1201(a)(1) by finding beyond a reasonable doubt that defendants used an instrumentality of interstate commerce when attempting to

---

[1]  Citations to "Doc. __, at __" refer to the documents in the district court record, as numbered on the docket sheet, and page numbers within those documents.  "GX __" refers to the numbered government exhibits admitted at trial; and "[Name] Br. __" refers to page numbers in that defendant's opening brief.  In these citations, we use "TM" for Travis McMichael, "GM" for Gregory McMichael, and "WB" for William Bryan.

seize or confine Arbery, and that defendants did so to fulfill their personal desires to carry out vigilante justice on a Black man they assumed to be a criminal.

3.  Whether the trial court acted within its broad discretion by admitting (1) a Facebook post from a neighborhood group and (2) records concerning where defendants' trucks were manufactured; and whether these evidentiary rulings substantially affected Travis McMichael's rights.

## STATEMENT OF THE CASE

On a Sunday afternoon, in a quiet residential neighborhood in Georgia, Ahmaud Arbery ran for his life.  Doc. 250, at 12; Doc. 248, at 16; GX 12.  For almost five terrifying minutes, Arbery tried to escape from three strangers who were chasing him in their pickup trucks:  Gregory McMichael, his son Travis McMichael, and their neighbor William Bryan.  GX 12.  These three white men assumed—incorrectly—that Arbery, a Black man, must have committed a crime in their neighborhood.

After chasing Arbery in their pickup trucks, the three men eventually trapped Arbery—"like a rat," as Gregory McMichael later boasted.  Doc. 248, at 98, 219-220; GX 27.34.  Travis McMichael then aimed a shotgun at Arbery.  Arbery, cornered and unarmed, tried to defend himself, but Travis shot Arbery.  GX 12.  Gravely wounded, Arbery stumbled forward, collapsed in the street, and died within minutes.  Doc. 250, at 127-129, 133.  The McMichaels and Bryan

stood by and watched; none offered any help or comfort to Arbery. Doc. 248, at 196; Doc. 250, at 133.

The McMichaels and Bryan were later convicted in state court for murdering Arbery. They then faced federal charges related to the events surrounding Arbery's killing, including a hate crime under 18 U.S.C. 245(b)(2)(B), attempted kidnapping under 18 U.S.C. 1201(a)(1), and use of a firearm during a crime of violence under 18 U.S.C. 924(c). A federal jury found them guilty of all charges. Those federal convictions are the subject of these appeals.

1. *Factual Background*

a. *How Defendants Pursued And Killed Arbery*

On February 23, 2020, Ahmaud Arbery went for a run, as he did almost every day. Doc. 248, at 119, 121. On this day, he ran through the looping roads of Satilla Shores, a quiet residential neighborhood in Brunswick, Georgia. Doc. 248, at 11, 121; GXs 1, 12. The publicly accessible neighborhood contains five connected streets: Satilla Drive, Burford Road (sometimes listed in maps as Burford Drive), Zellwood Drive, Jones Road, and Holmes Road:



GX 1.

Arbery, who lived a couple of miles away, had run through Satilla Shores several times before.  Doc. 248, at 121, 186.  He often stopped at a house on Satilla Drive that had long been under construction.  Doc. 248, at 186.  That emerging house had no doors, no interior walls, and no signs telling people to stay away. Doc. 248, at 138-139, 198; GX 5.  As on his prior visits, when Arbery stopped by that house on February 23, he took nothing, disturbed nothing, and committed no crimes—as surveillance video confirms.  Doc. 248, at 140, 194, 198; GX 5.  Still, two neighbors saw him that day and believed he did not belong in their neighborhood.  Doc. 248, at 55-56, 143; GX 27.40.

Those neighbors took very different actions.  One called the police—using the non-emergency line—to report a suspicious person at the construction site.

Doc. 248, at 56. That was it: although armed, this neighbor did not draw his weapon, did not confront Arbery, did not tell Arbery to stop, and did not pursue him. Doc. 248, at 83-84. The other neighbor, Gregory McMichael, summoned his adult son, armed himself, and pursued Arbery. Doc. 248, at 143.

Gregory McMichael lived with his son Travis on Satilla Drive, a few doors away from the house-under-construction. Doc. 248, at 142-143. Less than two weeks earlier, Travis had seen Arbery outside that house and called 911. Doc. 250, at 36. The responding officers did not find Arbery there, but they obtained surveillance video of him walking around the construction site, disturbing nothing, and they showed the video to Travis and Gregory McMichael. Doc. 250, at 37; GX 90. So on February 23, when Arbery ran by their driveway, Gregory recognized him, ran into his house, and exclaimed to Travis: "The guy's running down the street—let's go, let's go, let's go!" GXs 17.10, 17.11. Gregory and Travis grabbed their guns—a .357 Magnum revolver and a Remington 12-gauge shotgun, respectively—and jumped in Travis's pickup truck, a Ford F-150 with a confederate flag on its vanity plate. Doc. 248, at 143-144; Doc. 250, at 207.

The McMichaels quickly caught up to Arbery, who was running by William Bryan's house on Burford Road:



Doc. 248, at 145; GXs 1, 7.  The McMichaels yelled at Arbery from Travis's truck to stop running, but Arbery backed up to get away.  Doc. 248, at 145-146; GX 7.  The McMichaels put the truck in reverse and backed up alongside Arbery, who then ran forward to again get away from them.  Doc. 248, at 146; GX 7.  Witnessing this confrontation from his front porch, William Bryan did not call the police, but instead got in his own pickup truck to join the pursuit.  Doc. 248, at 148-149; GX 7.  Although Bryan had never seen Arbery before, and although he did not recognize the two white men chasing Arbery in their pickup truck, Bryan assumed that Arbery, the Black man being chased, must be a criminal.  Doc. 248, at 148-149; GX 96.2.

When Bryan got into his pickup truck, the McMichaels had already caught up to Arbery at the end of Burford Road and blocked Arbery's path with their pickup truck.  Doc. 248, at 150.  Gregory McMichael got out of the truck, armed

with his .357 Magnum, to engage Arbery. Doc. 248, at 150. Arbery, though, turned around and ran back up the street, toward William Bryan's house. Doc. 148, at 150. As Arbery reached Bryan's driveway, Bryan pulled out in his truck and tried to block his path, but Arbery ran around the truck. Doc. 248, at 153; GXs 15.1, 15.6. Bryan then drove toward Arbery and "cut him off pretty good," as Bryan later told the police, so much so that Arbery hit his truck, leaving a dent with fibers consistent with the t-shirt that Arbery was wearing. Doc. 248, at 155; GX 15.6.

After hitting Arbery, Bryan sped ahead and used his pickup truck to block Arbery's path out of the neighborhood, causing Arbery to cut down Holmes Road. Doc. 248, at 157-158; Doc. 250, at 223-225; GX 12. Bryan once more gave chase, while the McMichaels, who had circled the block to cut off Arbery's escape route, converged from the other end of the street. Doc. 248, at 159. Arbery tried to escape, but he eventually found himself surrounded by both pickup trucks near the intersection of Holmes Road and Satilla Drive. Doc. 248, at 160, 165-166; GX 12. As Gregory McMichael later told the police, Arbery was "trapped like a rat." GX 27.34. Although Arbery "was wanting to flee," Gregory recounted, "he was not going to get away." GX 27.34.

At this point, Travis had parked his truck in the middle of the street and gotten out with his shotgun, while Gregory was standing in the bed of the truck

with his .357 Magnum. Doc. 248, at 168; GXs 12, 27.40. Both pointed their guns at Arbery. Doc. 248, at 171. Travis repeatedly screamed, "Get on the ground! Get on the ground!" GX 27.40. Gregory shouted something like, "Stop! I'll blow your fucking head off!" GX 27.40. Arbery zig-zagged, seeking cover along the passenger side of the truck. GX 12. But Travis McMichael moved toward the front of the truck, keeping his shotgun trained on Arbery. Doc. 248, at 166; GX 12. Arbery then tried to grab Travis's shotgun and defend himself. GX 12. During the struggle, Travis fired the shotgun three times at Arbery, critically wounding him. GX 12; Doc. 250, at 120-121, 127.

Arbery stumbled forward and collapsed face first in the street. Doc. 250, at 133; GX 12. Although Arbery was still alive and breathing, neither the McMichaels nor Bryan rendered any aid to Arbery, who eventually bled to death on Holmes Road. Doc. 248, at 196; Doc. 250, at 133; GX 17.2. In fact, the only time Gregory McMichael touched Arbery after he collapsed was to see if Arbery had a weapon. GX 17.2. Arbery did not; in fact, he had nothing with him during his run, not even a phone or wallet. Doc. 248, at 179.

b.    *Why Defendants Pursued And Killed Arbery*

As to why defendants chased, trapped, and ultimately killed Arbery, the evidence at trial showed that they held longstanding hate and prejudice toward Black people, while also supporting vigilante justice.

**Travis McMichael**.  In his messages to friends and in his posts on social media, Travis McMichael often used racial slurs to describe Black people, referred to Black people as criminals, and expressed his support for vigilantism:

- Travis wrote, "I'd kill that fucking nigger," after seeing a video of a Black man playing a joke on a white man (Doc. 249, at 100; GXs 42, 42.1);

- Travis commented, "[b]een cooler if it blew that fucking niggers head off," after seeing a video of a Black man setting off a firecracker in his nostril (Doc. 249, at 96-98; GX 38);

- Travis praised or shared racist memes, including a picture of a person with Down syndrome wearing a shirt that said, "At least I'm not a nigger!" and a picture of someone in a Halloween costume depicting a wounded Trayvon Martin (a 17-year-old Black teenager who was shot and killed by a neighborhood vigilante as he returned home from a convenience store) (Doc. 249, at 49, 52; GXs 36.1, 46);

- Travis responded to a video of a Black woman stealing a purse from an elderly white woman by writing, "Goddamn savages" (Doc. 249, at 75; GXs 43, 43.2);

- Travis stated, in response to a video of Black people assaulting white people, that if Black "savages" attacked his family, "I would beat those monkeys to death" and "have the same remorse putting them down as I would with a rabid coon" (Doc. 249, 105-106; GX 44.2);

- Travis referred to thieves as "vermin" and wrote about the need to "make an example out of somebody" (Doc. 249, at 83-84; GX 41);

- Travis commented on a Facebook post showing someone shot after a home invasion robbery, saying that he too keeps his shotgun loaded with ammunition that "will rip someone to shreds" (Doc. 249, at 84-85; GXs 45, 45.1); and

- Travis used the word "nigger" in many other contexts, including a comment that what he loves about his job is that "[z]ero niggers work

with me" (Doc. 249, at 40; GX 35), a reference to a co-worker as a "nigger-lover" (Doc. 251, at 105, 107), and a description of a restaurant as a "[n]igger [b]ucket" (Doc. 249, at 42, GX 37).

**Gregory McMichael**. Gregory McMichael also spoke with anger, meanness, and ugliness about Black people, and he also expressed his support for vigilantism, as the examples below highlight:

- Gregory, while on duty as an investigator for the district attorney's office, told a crime victim that "all these Blacks are nothing but trouble; I wish they would all die" (Doc. 251, at 127);

- Gregory referred to one of his former tenants as a "walrus" because she was "a big fat black woman," and boasted that when he cut off her air conditioning for nonpayment of rent, "You should have seen how fast her fat black ass come with the rent check" (Doc. 251, at 56-57);

- Gregory responded to a social media post about a stolen surfboard by writing, "Maybe I'll catch the sorry SOB up here in Ga. We still hang horse and board thieves up here. Woe be unto the sticky-fingered bastard" (Doc. 249, at 86; GX 53.1);

- Gregory posted a picture on social media of a woman holding a shotgun, with a caption that said, "A gun in the hand is worth more than the entire police force on the phone" (Doc. 249, at 87; GX 51); and

- Gregory shared what he described as the "most meaningful" meme he had ever seen: a photo of a white man pointing a handgun, captioned: "If violent crime is to be curbed, it is only the intended victim who can do it. The felon does not fear the police, * * * what he must be taught to fear is his victim" (Doc. 249, at 88; GX 50).

**William Bryan**. Bryan, too, repeatedly referred to Black people using racist slurs, expressed his anger that his daughter had a Black boyfriend, and associated Black people and criminality, as these examples show:

- Days before Arbery was killed, Bryan told one person that his daughter "has her a nigger now" and separately told another that the boyfriend would "fit right in with the monkeys" (Doc. 249, at 61, 63-65; GXs 56-57);

- When someone texted a picture of Bryan's daughter with her Black boyfriend and said, "Just wanted to share with you and start your day with a good PUKE," Bryan responded, "Like I said she don't give a fuck about herself why should we" (Doc. 249, at 67-68; GXs 54, 54.1);

- On successive years on Martin Luther King Jr. Day, Bryan messaged a friend to say he was working "so all the niggers can take off!" and referenced a "monkey parade" on that day (Doc. 249, at 56-58; GXs 58, 62);

- Bryan wrote that a friend's wife should try to get disability benefits "like the niggers that don't need it" (Doc. 249, at 79; GX 61); and

- Responding to a Facebook post about a dirt bike being stolen, Bryan shared his assumption that the crime was committed by a "boot lip"—a racial slur he used to describe Black people—even though no information suggested that a Black person stole the bike (Doc. 249, at 81; GX 63).

All three defendants also assumed, without evidence, that Arbery must have committed a crime. For example, Gregory McMichael told the police that when he saw Arbery running on the street in front of his house, he recognized Arbery from surveillance video and assumed that Arbery must have just committed a crime. GX 17.10. Likewise, Bryan said that when he saw Arbery running down the street with the McMichaels chasing him, he also assumed that Arbery must have committed some crime, even speculating that Arbery may have just shot someone.

GX 96.3.  Defendants were wrong:  as the police later confirmed, Arbery did not trespass or commit any other crime in Satilla Shores.  Doc. 248, at 198, 219-220.

  *c.*  *Where Defendants Pursued And Killed Arbery*

  The publicly accessible streets of Satilla Shores, where Arbery ran and was killed, are in Glynn County, Georgia.  Doc. 250, at 145-146; GXs 1, 104.  Glynn County considers those streets to be public for several reasons.  First, the streets in the neighborhood appear on the County's list of public roads.  Doc. 250, at 145-146; GX 104.  Second, public records show that the County regularly responded to service requests for the streets in the neighborhood, including filling a gap in a curb with asphalt, cleaning up a spill from a trash truck, and remediating flooded roads—actions that the County does not undertake for private roads.  Doc. 250, at 150-151; GX 105.  Third, county records also show that Glynn County budgeted public funds to pave the streets in Satilla Shores.  Doc. 250, at 180; GX 106.  Although no records exist showing exactly when the County took formal title to these roads, the county official who manages public roads testified that he has "no doubt" that the County maintained the streets where Arbery was pursued and killed.  Doc. 250, at 184.

*2.     Procedural History*

In state proceedings, a jury convicted all three defendants of murder and

other crimes, and the court sentenced each defendant to life in prison.  See *Georgia*

v. *McMichael, et al.*, No. CR-2000433 (Glynn County Superior Court).

In federal proceedings, a grand jury returned a five-count indictment, three

counts of which are relevant on appeal:

> **Count 1, Interference with Rights, 18 U.S.C. 245(b)(2)(B)**, against
> Travis and Gregory McMichael for aiding and abetting one another in
> intimidating and interfering with Arbery, because of race or color and
> because he was exercising his right to use a public street.  This count also
> alleged that the offense included kidnapping and resulted in Arbery's
> death;
>
> **Count 2, Interference with Rights, 18 U.S.C. 245(b)(2)(B)**, against
> William Bryan for aiding and abetting the McMichaels in intimidating
> and interfering with Arbery, because of race or color and because he was
> exercising his right to use a public street; and
>
> **Count 3, Attempted Kidnapping, 18 U.S.C. 1201(a)(1) and (d)**,
> against all three defendants for aiding and abetting one another in using
> instrumentalities of interstate commerce—trucks—to attempt to confine
> Arbery against his will and hold him for some benefit.

Doc. 1.[2]

The matter proceeded to trial.  When the government concluded its case-in-

chief, defendants moved for acquittal on some counts and reserved further Rule 29

_____

[2]  Counts 4 and 5 charged Travis McMichael and Gregory McMichael,
respectively, under 18 U.S.C. 924(c) with using a firearm during a crime of
violence.  The predicate crime of violence was the hate crime charged in Count 1
under 18 U.S.C. 245(b)(2)(B).  Doc. 1, at 5-6.

motions for after trial.  Doc. 251, at 133-134, 139.  On the attempted kidnapping charges, all defendants argued that the government did not prove the interstate commerce element.  Doc. 251, at 133-135, 139.  On the hate-crime charge, Bryan argued that the government did not prove that he acted because of Arbery's race and because of Arbery's use of public streets.  Doc. 251, at 134-135.  The district court denied the motions.  Doc. 251, at 139.  After the close of all evidence, defendants renewed the motions, which the court again denied.  Doc. 251, at 175.

The jury convicted defendants on all counts.  Doc. 218.  Bryan did not renew his Rule 29 motion post-trial, but Gregory and Travis McMichael did, arguing that the evidence was insufficient to convict them of a hate crime or attempted kidnapping.  Docs. 228-229.  The court denied the motions in a comprehensive written opinion, concluding that the evidence "was more than sufficient" to sustain the convictions.  Doc. 257, at 27.

The court sentenced Travis McMichael to life imprisonment plus ten years, Gregory McMichael to life imprisonment plus seven years, and Bryan to 420 months' imprisonment—all to be served concurrently with their state sentences. Docs. 263-264, 298.

3.    *Standards Of Review On Appeal*

**Sufficiency Challenges.**  This Court reviews de novo whether sufficient evidence exists to support a challenged conviction.  See *United States* v. *Reeves*,

742 F.3d 487, 497 (11th Cir. 2014).  Under this standard, the Court views the evidence in the light most favorable to the jury verdict, draws all inferences in favor of that verdict, and determines whether a reasonable jury could have found defendants guilty beyond a reasonable doubt.  *Ibid.*  A jury's verdict "cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt."  *United States* v. *Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013).  Finally, where a defendant did not preserve his sufficiency challenge, a defendant cannot obtain reversal unless "necessary to prevent a manifest miscarriage of justice."  *United States* v. *Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013) (quoting *United States* v. *Greer*, 440 F.3d 1267, 1271 (11th Cir. 2006)).

**Evidentiary Challenges**.  This Court reviews evidentiary rulings for abuse of discretion.  See *United States* v. *Crabtree*, 878 F.3d 1274, 1287 (11th Cir. 2018).  Under this standard, this Court "must affirm" unless the district court "has made a clear error of judgment, or has applied the wrong legal standard."  *United States* v. *Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1063 (2005).  Deference is "the hallmark of abuse-of-discretion review," and reversal should occur only when an evidentiary decision is "manifestly erroneous."  *Ibid.* (citation omitted).  When an evidentiary objection is not preserved below, the

Court reviews only for plain error. See *United States* v. *Campbell*, 223 F.3d 1286, 1288 (11th Cir. 2000), cert. denied, 534 U.S. 829 (2001).

## SUMMARY OF THE ARGUMENT

1. Ahmaud Arbery would be alive today had he not been a Black man running on public streets when defendants pursued and killed him. The jury thus properly convicted defendants of a hate crime under 18 U.S.C. 245(b)(2)(B), and extensive evidence supports the verdicts. First, the jury heard that defendants detested Black people, associated Black people with criminality, and yearned to carry out vigilante justice. Second, the jury learned that defendants acted on those toxic views: defendants assumed that because Arbery was a Black man running on their neighborhood streets, he must be a criminal, and they hunted him on those streets for several minutes before killing him. Third, the jury received plentiful evidence showing that the streets of Satilla Shores were public.

In response, two defendants (Gregory McMichael and William Bryan) try to explain away their actions, arguing that they pursued Arbery simply because they assumed he had committed a crime. But these defendants cannot escape liability so easily. First, they would not have assumed Arbery to be a criminal but for his being Black and but for him running on their neighborhood streets, as the jury reasonably determined. Second, courts have uniformly ruled that crimes can have more than one cause. So because the crime here would not have occurred but for

Arbery being a Black man who was running on a public street, these defendants can still be convicted even if their primary motivation were to catch an assumed criminal.

The other defendant, Travis McMichael, does not challenge the jury's finding that he acted because of Arbery's race and because of Arbery's use of a street. Instead, Travis McMichael argues that insufficient evidence existed to show that the streets of Satilla Shores were public. But his arguments misconstrue Section 245 and misunderstand Georgia property law. Under federal law, the streets are public because the county provides and administers them. Under state law, the streets are public because they are open to and used by the public. Thus, a reasonable jury could and did determine, beyond a reasonable doubt, that all three defendants were guilty of violating 18 U.S.C. 245(b)(2)(B).

2. Defendants fare no better challenging their convictions for attempted kidnapping. They do not even contest the first element of that crime, that they attempted to unlawfully seize or confine Arbery. As to the next element, whether defendants acted to secure a benefit, the evidence showed that defendants wanted the personal satisfaction of inflicting vigilante justice on a Black man they assumed to be a criminal, or even just a reputational boost as neighborhood crime-stoppers. As to the final element, whether defendants used instrumentalities of interstate commerce to commit the crime, the evidence showed that defendants

used their pickup trucks to pursue and trap Arbery. Importantly, the government did not need to prove that those trucks traveled out of state during the offense; courts have unanimously rejected that unsound legal argument. Thus, a reasonable jury could and did determine, beyond a reasonable doubt, that defendants violated 18 U.S.C. 1201(a)(1) and (d).

3. Travis McMichael's separate evidentiary challenges fall far short of the high threshold needed to overturn his convictions. First, the district court acted within its broad discretion when admitting these exhibits—a Facebook post by homeowners in Satilla Shores discussing whether to privatize their streets, and two records detailing where defendants' trucks were manufactured. Second, the jury had sufficient evidence to convict Travis McMichael of a hate crime and attempted kidnapping even without these inconsequential exhibits. Thus, this Court should reject Travis McMichael's evidentiary challenges and affirm his convictions.

## ARGUMENT

## I

## THE JURY REASONABLY CONVICTED DEFENDANTS OF A HATE CRIME

As the district court correctly held, the government provided more than enough evidence for the jury to find each defendant guilty of the hate-crime charges in Counts 1 and 2. Doc. 257, at 6. In these appeals, defendants renew their sufficiency challenges, offering the same flawed arguments that the district

court properly rejected. TM Br. 25-52; GM Br. 11-19; WB Br. 18-26. This Court should affirm their convictions because the evidence sufficiently showed that each defendant, either independently or aiding and abetting another:

(1)    used "force or threat of force;"

(2)    willfully "injure[d], intimidate[d] or interfere[d] with" Arbery;

(3)    acted "because of [Arbery's] race [or] color;" and

(4)    acted because Arbery was "participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof," specifically the public streets in Glynn County, Georgia.

18 U.S.C. 245(b)(2)(B); Doc. 216, at 13 (jury instructions); *United States* v. *White*, 846 F.2d 678, 694 (11th Cir.), cert. denied, 488 U.S. 984 (1988).

Defendants no longer contest the first two elements. Instead, their appeals challenge whether sufficient evidence showed they acted because of Arbery's race and because of his use of public streets, including whether sufficient evidence proved that those streets were provided or administered by Glynn County. For the Court's convenience, we summarize here which defendants have raised what challenges to the government's evidence supporting the Section 245 convictions:

| Element of 18 U.S.C. 245(b)(2)(B) | Travis McMichael | Gregory McMichael | William Bryan |
|---|---|---|---|
| 1. *Used or threatened force;* | Unchallenged | Unchallenged | Unchallenged |
| 2. *Willfully injured, intimidated, or interfered with Arbery;* | Unchallenged | Unchallenged | Unchallenged |
| 3. *Acted because of Arbery's race or color;* | Unchallenged | Sufficiency | Sufficiency |
| 4a. *Acted because Arbery was using a street...* | Unchallenged | Sufficiency | Sufficiency |
| 4b. *...that was provided or administered by Glynn County.* | Sufficiency and evidentiary | Sufficiency | Sufficiency |

Defendants' challenges fail for several reasons, but a common flaw is defendants' misunderstanding of the text and purpose of 18 U.S.C. 245.  Congress added Section 245 to the Civil Rights Act of 1968 "to deter and punish those who would forcibly suppress the free exercise of civil rights enumerated in that statute." *Johnson* v. *Mississippi*, 421 U.S. 213, 224 (1975).  By criminalizing interference with an individual's civil rights, "Section 245 puts teeth into the enforcement of federal rights guaranteed by the Civil Rights Act."  *United States* v. *Allen*, 341 F.3d 870, 882 (9th Cir. 2003) (quoting *United States* v. *Furrow*, 125 F. Supp. 2d 1178, 1184 (C.D. Cal. 2000)), cert. denied, 541 U.S. 975 (2004).  Thus, as this Court has emphasized, Section 245 "must be construed to achieve its broad remedial purpose," which is to curb "a wide range of racially motivated violence and intimidation."  *White*, 846 F.2d at 695.

Of course, Section 245 does not prohibit *all* racially motivated violence. As defendants correctly note, even an avowed bigot does not violate Section 245 simply because he commits a violent crime against a Black person. WB Br. 23. Rather, the statute applies only when a defendant uses force or threat of force to injure, intimidate, or interfere with a victim, and only when two more factors are present: (1) the defendant acted because of the victim's race or membership in another defined category; and (2) the defendant acted because of the victim's enjoyment or participation in an activity the statute protects. See 18 U.S.C. 245(b)(2)(B). Here, the evidence sufficiently proved both relationships: defendants pursued Arbery because of his race and because of his use of a public street.

A.    *The Jury Reasonably Concluded That Defendants Pursued Arbery Because He Was Black*

Minimizing the substantial evidence of their racial hatred toward Black people, Gregory McMichael and William Bryan argue that Arbery's race played too little a role to justify their convictions under Section 245.[3] GM Br. 11-16; WB Br. 18-24. But as the district court correctly ruled, defendants' arguments fail to heed the proper standard of review, which is whether, in the light most favorable to

---

[3] Travis McMichael does not challenge the jury's finding that he used force or threat of force to injure and intimidate Arbery because Arbery was Black.

the jury's verdict, the jury could have determined that defendants acted because of Arbery's race. Doc. 257, at 19-20; see also *United States* v. *Reeves*, 742 F.3d 487, 497 (11th Cir. 2014). The evidence easily passes this test.

1. To begin, all parties agree on the legal standard required for conviction: the government needed to prove that the offense would not have occurred "but for" Arbery's actual or perceived race or color. GM Br. 11; WB Br. 18. As the jury instructions explained, this standard does not require the government to prove that Arbery's race was the "sole or only motive for the offense." Doc. 216, at 18. Rather, defendants could be found guilty "even if there was more than one reason for the offense." Doc. 216, at 18. Indeed, Section 245 *requires* more than one reason for the offense: that the defendants acted "because of" Arbery's race, and that they acted "because of" his use of the public streets. 18 U.S.C. 245(b)(2)(B). Thus, all the government needed to prove (beyond a reasonable doubt) to satisfy the "because of" elements is that these factors "played a determinative role in a defendant's decision to commit the offense." Doc. 216, at 18.

These jury instructions, which defendants did not and do not now challenge, track language from the Supreme Court and this Court on how to interpret other criminal statutes that require "but for" causation. See *Burrage* v. *United States*, 571 U.S. 204, 212 (2014); *United States* v. *Benjamin*, 958 F.3d 1124, 1132 (11th Cir.), cert. denied, 141 S. Ct. 561 (2020). This standard "is not a difficult burden

to meet." *United States* v. *Salinas*, 918 F.3d 463, 466 (5th Cir. 2019) (internal

quotation marks and citation omitted).  After all, "but-for causality does not require

that a single factor alone produce the particular result."  *United States* v. *Feldman*,

936 F.3d 1288, 1311 (11th Cir. 2019).

Thus, even accepting defendants' arguments that other factors caused them

to use or threaten force to injure or intimidate Arbery (GM Br. 14-15; WB Br. 19),

the jury's verdict must still stand "so long as the other factors alone would not

have" caused them to do so.  *Feldman*, 936 F.3d at 1311 (quoting *Burrage*, 571

U.S. at 211); see also *Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020)

("Often, events have multiple but-for causes.").

2.  Contrary to the claims of Gregory McMichael and William Bryan, the

government presented ample evidence that Arbery's race was a but-for cause of

each of their actions.  For example, the government introduced evidence of their

racial animus toward Black people and their repeated association of Black people

with criminality.[4]  Indeed, the district court characterized "the amount and nature

---

[4]  Although defendants filed a motion in limine to preclude this evidence, the magistrate judge ruled that this evidence was "plainly relevant [under Rule 404(b)] to determining whether Defendants acted with racial animus during the events forming the basis of the charges against them."  Doc. 151, at 8; see also Doc. 180 (order affirming the magistrate judge's order in full).  Defendants do not challenge on appeal the admission of this evidence.

of derogatory racial evidence introduced" against defendants as "stunning."  Doc. 257, at 18.

As Bryan acknowledges (WB Br. 22), he has a long history of making racist comments about Black people.  On successive Martin Luther King Jr. Days, for example, including the month before Arbery's killing, he sent these text messages:



GXs 59, 62.

Bryan also repeatedly expressed his disdain about his daughter dating a Black man, including this text just four days before Arbery was killed:



GX 57.  Bryan also used such language publicly on Facebook, including a racial slur to share his assumption that a Black person had stolen a dirt bike:  "My money is still on boot lip."  Doc. 249, at 81; GXs 63, 63.1.

Gregory McMichael, too, freely expressed his hatred toward Black people. For example, during his prior employment as an investigator for the district attorney's office, he "vilif[ied] a deceased civil rights activist at length," telling a crime victim that "all these Blacks are nothing but trouble; I wish they would all die."  Doc. 257, at 19 (quoting Doc. 251, at 127).  He also posted a race-based meme on Facebook stating that white Irish slaves were treated worse than any other race in the United States:  "The Irish are not pussies looking for free shit." GX 52.  The jury reasonably could rely on this evidence when determining that race played a determinative role in Bryan and Gregory McMichael's actions toward Arbery.

Indeed, in denying Gregory McMichael's motion in limine to exclude similar evidence of his racial bias, the district court held that "there is significant probative value" in Gregory McMichael's past comments because they "show a lengthy and ongoing pattern of racist views and racial animus."  Doc. 180, at 11.  And Bryan concedes this evidence was "relevant and admissible."  WB Br. 20.  Cf. *United States* v. *Dunnaway*, 88 F.3d 617, 619 (8th Cir. 1996) ("Because [defendant] was charged with a racially motivated crime, [18 U.S.C. 245(b)(2)(B),] evidence of his racist views, behavior, and speech were relevant and admissible to show discriminatory purpose and intent, an element of the charges against him.").

Beyond defendants' racial animus toward Black people, the jury further heard how the McMichaels reacted differently to neighborhood occurrences based on the race of those involved.  First, the jury heard that the McMichaels did not pursue all strangers who ran by their home:  when a new white neighbor jogged past the McMichaels' home, for example, the McMichaels did not stop him, yell at him, or chase him—even though they had never met him.  Doc. 248, at 45-46.  Second, despite knowing that white people committed crimes in the neighborhood, and despite seeing surveillance video of white people entering the house-under-construction, the McMichaels never tried to catch any suspected white criminals.  Doc. 249, at 24-25; Doc. 250, at 23-24, 29-30, 35-36.  In fact, when Gregory McMichael saw a white criminal suspect in the neighborhood, he did not chase that

man or try to detain him—he instead called the police, using the non-emergency line. GM Ex. 12; Doc. 251, at 166-167. This differential treatment for white people also supports the jury's finding that Arbery's race played a determinative role in the McMichaels' conduct, as the district court concluded when it rejected their post-trial motion. Doc. 257, at 19-20.

In sum, Gregory McMichael's differential treatment of Black and white people in his neighborhood, combined with his disproportionate response to someone he suspected of committing the minor crime of trespassing, shows that race was indeed more important than Arbery's "biological sex, the shorts he was wearing, his hairstyle, or his tattoos." GM Br. 15. Likewise, for Bryan, the jury's verdict did not rest on "mere speculation or conjecture" that Arbery's race caused him to act. WB Br. 23. To the contrary, when Bryan saw a Black man whom he did not know being chased by two white men he did not recognize, his "instinct" told him that the Black man was a criminal, and he was so sure of that racial assumption that he acted on it. GX 96.2. Thus, because the jury could and did conclude beyond a reasonable doubt that Arbery's race played a determinative role in the crime, this Court should reject defendants' sufficiency challenge on this element.

*B.*    *The Jury Reasonably Concluded That Defendants Pursued Arbery Because Of His Use Of A Public Street*

1.  Gregory McMichael and William Bryan also fall short in their sufficiency challenge to whether they intimidated and interfered with Arbery because he was engaged in a federally protected activity—namely, enjoying the use of a public street.[5]  GM Br. 16-19; WB Br. 24-26.  Notably, though, these defendants do not dispute that they used or threatened force to willfully injure, intimidate, or interfere with Arbery *while he was running through the streets*.  Of course, the evidence here shows much more than a simple correlation between Arbery being attacked and Arbery running through the streets; it shows that defendants would not have taken the actions they did but for Arbery enjoying his right to run through the streets of their neighborhood.  Indeed, defendants' own statements and actions show as much:

- While Arbery was running on the street, Gregory exclaimed to his son, "Travis, the guy's running down the street!  Let's go, let's go, let's go!" (GX 17.11);

- When Gregory called 911, the first thing he said to the operator after giving his location was, "There's a Black male running down the street" (GX 9);

---

[5]  Travis McMichael does not contest that he acted because Arbery was using the streets, though he challenges whether the evidence sufficiently proved that those streets were "provided or administered by" Glynn County, as Section 245(b)(2)(B) requires.  We address that argument in Part C, *infra*.

- When Gregory gave a statement to the police, he said, "the whole thing started when I saw this guy running on the street" (GX 27.29);

- Bryan, too, joined the chase after he saw Arbery running on the street (GX 15.1); and

- During the chase, Bryan repeatedly used his truck to stop Arbery from running through the streets (GX 15.1).

Defendants, though, ignore this evidence and instead argue that they pursued Arbery simply because they assumed that he committed a crime. Gregory McMichael, for example, points to evidence showing that he recognized Arbery from surveillance video before giving chase (even though the video does not show Arbery committing a crime). GM Br. 17-18. Likewise, Bryan argues that he would never have joined the pursuit but for his assumption that Arbery committed a possibly serious crime. WB Br. 26; GX 96.3. True enough, but not enough.

The government has always acknowledged that Arbery's death would not have occurred but for defendants' assumption that he had committed a crime. Indeed, the government proved that the reason defendants assumed Arbery committed a crime was because of his race and because he was running down the street. As this Court has repeatedly held, "but-for causality does not require that a single factor alone produce the particular result." *Benjamin*, 958 F.3d at 1131-1132 (quoting *Feldman*, 936 F.3d at 1311). That is because "[o]ften, events have multiple but-for causes." *Bostock*, 140 S. Ct. at 1739.

Put simply, the government did not need to prove that Arbery's use of the streets was the sole or even the primary motive for defendants' conduct. In fact, this element may be satisfied even if Arbery's use of the streets played only a minor role in defendants' decision to act—"if, so to speak, it was the straw that broke the camel's back." *Benjamin*, 958 F.3d at 1132 (citation omitted). Here, Arbery's use of the streets was at least the straw that broke the camel's back.

As the district court recounted, "there was substantial evidence that the McMichaels were aware-of, and even preoccupied-with, Arbery's presence in their neighborhood during recent weeks—suggesting they would not have done what they did but-for his presence on the streets of Satilla Shores." Doc. 257, at 16-17 (listing the evidence). Similarly, Gregory McMichael expressed support for vigilantism (Doc. 249, at 86-87; GXs 50-51, 53), and both he and Bryan have a long history of expressing hatred toward Black people (Doc. 249, at 56-58, 60-61, 81; GXs 56-58, 62-63). Thus, the jury could reasonably infer that defendants acted because they wanted to stop a suspected Black criminal from using *their neighborhood streets*.

2. Defendants, however, still say that Arbery's use of the streets was mere happenstance, proclaiming that they would have attacked Arbery even if he had only run through their neighbors' yards and never set foot in the streets. GM Br. 17; WB Br. 25-26. Although the jury certainly *could* have concluded that Arbery's

use of the streets was mere happenstance, it was not *required* to draw this inference. To the contrary, "the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States* v. *Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013). And now that the jury has rejected defendants' proposed inferences, the jury's verdict "cannot be overturned if *any* reasonable construction of the evidence would have allowed the jury to find the defendant[s] guilty beyond a reasonable doubt." *Ibid.* (emphasis added).

Defendants also do not cite any case where a court reversed a jury's verdict on a Section 245 charge based on insufficient evidence on this element. That is unsurprising given the deferential standard of review. Indeed, in other hate-crime cases brought under Section 245, courts have routinely upheld jury verdicts that found that defendants attacked their victims because the victims were engaged in a protected activity like using a public street.

For example, when a defendant tried to overturn his Section 245 conviction by arguing that the attack "would have happened anywhere," the Eighth Circuit rejected his argument as "frivolous," explaining that "it is clear that the natural and probable consequences of [defendant's] acts were to prevent [the victim] from enjoying the recreational facilities" where the attack occurred. *United States* v. *Price*, 464 F.2d 1217 (8th Cir. 1972). Likewise, the Sixth Circuit found "no merit

in the claim that the prosecution must fail because of an *absence of direct evidence that the beating * * * related to * * * the fact that [the victim] had been in a place of public accommodation.*" *United States* v. *Ebens*, 800 F.2d 1422, 1429 (6th Cir. 1986) (emphasis added), abrogated on other grounds by *Huddleston* v. *United States*, 485 U.S. 681 (1988); see also *United States* v. *Nelson*, 277 F.3d 164, 197-198 (2d Cir.) (rejecting sufficiency challenge on these grounds), cert. denied, 537 U.S. 835 (2002).

As these decisions recognize, the government need not offer direct evidence of why a defendant acted as he did. Instead, the government may rely on circumstantial evidence to show what caused the defendant to act. Here, the government relied on both direct evidence (defendants' own statements and actions that day) and circumstantial evidence (defendants' prior acts and the circumstances of the crime) to prove this element. The jury could and did reasonably rely on this evidence to determine that defendants would not have taken the actions they did but for Arbery's use of the public streets in their neighborhood.

3. Finally, Bryan argues that Section 245 was never intended to cover a crime occurring on a neighborhood street like this one. WB Br. 24-25. He could not be more wrong. Defendants' actions exemplify the "racial terrorism" that Congress intended to address when it enacted Section 245. S. Rep. No. 721, 90th Cong., 2d Sess. 4 (1967). As the Second Circuit highlighted, there is a "long-

standing and intimate connection between public violence and racial and religious oppression," and an unmistakable "fear felt by victims of violence, in particular by those who have been singled out on the basis of their race or religion." *Nelson*, 277 F.3d at 197-198. Thus, this crime falls well within the "wide range of racially motivated violence and intimidation" that Congress intended to cover when it enacted Section 245. *White*, 846 F.2d at 695.

In sum, ample evidence allowed the jury to reasonably infer that defendants pursued Arbery because he was using the public streets in defendants' neighborhood. Thus, "Arbery's enjoyment of a public facility played a determinative role in the defendant's decision to commit the offense," and the verdict should not be disturbed. Doc. 216, at 19.

C. *The Jury Reasonably Concluded That Defendants Pursued Arbery On Streets Provided Or Administered By Glynn County*

Defendants also falter in their challenge to whether the jury reasonably found that Arbery used "the public streets provided or administered by Glynn County, Georgia." Doc. 216, at 13 (jury instructions). This challenge focuses on Section 245's requirement that the victim was "participating in or enjoying any

benefit, service, privilege, program, facility, or activity *provided or administered by any State or subdivision thereof*." 18 U.S.C. 245(b)(2)(B) (emphasis added).[6]

1. As courts have uniformly held, Section 245's list of protected rights includes using public streets: "the term 'facility' clearly and unambiguously includes city streets within its meaning." *Nelson*, 277 F.3d at 192-193; see also *United States* v. *Mungia*, 114 F.3d 1181, 1181 (5th Cir.) (holding that "the streets and sidewalks on which the victims were shot qualify as a 'facility ... provided or administered by any State or subdivision thereof'" (citation omitted)), cert. denied, 522 U.S. 876 (1997); *United States* v. *Cazares*, 788 F.3d 956, 990 (9th Cir. 2015) ("Defendants fail to provide a convincing argument that the street was not a facility under § 245(b)(2)(B)."), cert. denied, 579 U.S. 919 (2016); cf. *White*, 846 F.2d at 695 n.27 (noting that "the city provided the streets on which the demonstrators marched" as an alternative basis to uphold a guilty verdict on Section 245 charges).

Given this precedent, defendants do not challenge that Section 245(b)(2)(B) protects the right to use a public street. Instead, they seek to overturn the jury's

---

[6] Although Gregory and Travis McMichael previously raised this argument in their Rule 29 motions, Bryan did not. Doc. 251, at 134-135. When a sufficiency argument is not preserved below, the Court will reverse a conviction only if "necessary to prevent a manifest miscarriage of justice." *United States* v. *Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013) (quoting *United States* v. *Greer*, 440 F.3d 1267, 1271 (11th Cir. 2006)). This heightened standard applies to Bryan, although the challenge fails under any standard.

verdict by arguing that the government did not sufficiently prove that the streets of Satilla Shores were public. TM Br. 31-48. They contend that Section 245 requires proof—under state property law—that a public entity holds proper title to the land. TM Br. 31-48. But Section 245's text does not require this, no court has ever demanded this, and the legislative history does not support this assertion.

First, start with Section 245's text, because "[i]n statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst.* v. *Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). The ordinary meanings of "provided" and "administered" do not include formal ownership, dominion, or control. "Provide," for example, means "to supply what is needed for sustenance or support." Webster's Third New International Dictionary 1827 (1968). And "administer" means "to manage the affairs of" or to "to direct or superintend the execution, use, or conduct of." *Id.* at 27-28.

Second, nothing else in the statute's text requires the County to have formal title under state law. "It is a fundamental principle of statutory interpretation that 'absent provisions cannot be supplied by the courts.'" *Rotkiske* v. *Klemm*, 140 S. Ct. 355, 360-361 (2019) (alteration omitted) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 94 (2012)). Congress could have limited Section 245's protections to state-owned property, but Congress did not.

Third, the statute uses the word "any" to modify an already long list of protected rights, including "any" benefit, service, privilege, program, facility, or activity. 18 U.S.C. 245(b)(2)(B). This text underscores Congress's intent that the statute apply broadly. See *United States* v. *Rodgers*, 466 U.S. 475, 479 (1984) (emphasizing statute's use of the word "any" in rejecting a "constricted construction" of a criminal statute). By using the word "any," the statute connotes a broad spectrum of facilities that a public entity provides or administers in some way.

Finally, if any doubt existed about the statute's text, the Court would be free to review the legislative history, which shows that "the sponsors of the bill intended to address a wide range of racially motivated violence and intimidation." *White*, 846 F.2d at 695. Even the bill's opponents acknowledged that Section 245 would reach crimes interfering with the use of public streets: "Certainly, the public streets and sidewalks are facilities provided by a State or subdivision." 114 Cong. Rec. 1029 (1968) (Sen. Eastland).

In sum, defendants' position conflicts with Section 245's text, this Court's mandate that Section 245 be construed "to achieve its broad remedial purpose," and Congress's intent. *White*, 846 F.2d at 695. This Court should thus reject defendants' argument that Section 245 requires proof—under Georgia property

law—that the County had "dominion and control" over the streets of Satilla Shores.  TM Br. 36.

2.  Instead, this Court should adopt the district court's well-reasoned ruling that for a street to be "provided or administered" by the state, "a state or political subdivision maintains the particular facility in a condition suitable for use."  Doc. 257, at 10.  As the court explained, "regardless of whether the local government *owns* the particular facility, if it supplies the resources or oversees the tasks necessary for the public to use it, then the facility is 'provided or administered by' that government."  Doc. 257, at 11.  And in this case, it is "obvious" based on the "copious" evidence offered at trial that Glynn County did indeed maintain the streets of Satilla Shores for public use (Doc. 257, at 14 n.4, 15):

- The county official who oversees public streets in Glynn County testified that the streets in Satilla Shores are officially designated as public streets and maintained by the County (Doc. 250, at 160, 184, 182, 184);

- Glynn County has serviced roads in Satilla Shores over the years, regularly responding to residents' requests for service, including filling a gap in a curb with asphalt, cleaning up a spill from a trash truck, and remediating flooded roads (Doc. 250, at 150-151; GX 105, at 56, 67, 82);

- Glynn County does not fulfill requests for service on private roads (Doc. 250, at 151);

- A county document listing all the streets in Glynn County classifies the streets in Satilla Shores as "public" (GX 104, at 15, 23, 31, 37); and

- Glynn County Commission minutes show that the County accepted bids to pave roads in Satilla Shores (GX 106, at 1-3, 5-7).

Defendants do not challenge this evidence's admissibility on appeal.[7] Instead, they nitpick at the details, arguing that the government did not provide "evidence about the composition of the streets (whether concrete, asphalt, or other product) or how long neighborhood streets typically last." TM Br. 47. But as the district court explained in rejecting these arguments, the jury did not need any extra evidence to reasonably infer that the County serviced the roads where defendants pursued Arbery: "After all, the records provide direct evidence that this work was called for and contemplated—and the evidence regarding the chase itself plainly shows that the streets of Satilla Shores were in working order." Doc. 257, at 14. Thus, the evidence satisfies Section 245(b)(2)(B)'s requirement that the County provided and maintained those streets.

3. Finally, the jury could have reached the same conclusion under Georgia law. Georgia law states that a "'Public road' means a highway, road, street, avenue, toll road, tollway, drive, detour, or other way that either is open to the public or has been acquired as right of way, and is intended to be used for enjoyment by the public and for the passage of vehicles." Ga. Code Ann. § 32-1-3(24) (West 2023). Here, everyone agrees that the streets of Satilla Shores are open to and used by the public. Thus, defendants miss the mark by arguing that

---

[7] Travis McMichael challenges other evidence relating to whether Glynn County provided or maintained the streets, which we discuss in Part D, *infra*.

Glynn County never accepted the 1958 dedication from the original landowners of Satilla Shores. TM Br. 34-38. As Georgia courts have held, even when county officials repeatedly reject a public land dedication, "public use is sufficient to complete the dedication." *Morris* v. *Sumter Cnty.*, 365 Ga. App. 323, 328, 878 S.E.2d 81, 87 (2022) (citation omitted), reconsideration denied (Sept. 15, 2022). The same conclusion applies here, and the jury's verdict should stand.

D.     *Travis McMichael's Evidentiary Challenge Does Not Justify Reversal*

Travis McMichael also seeks reversal of his Section 245 conviction based on a supposed evidentiary error regarding a Facebook post. TM Br. 52-56. This Facebook post contains a discussion by Satilla Shores homeowners, after Arbery's death, about whether to privatize their streets. GX 67. During trial, Travis McMichael objected to the admission of this evidence, contending that it improperly sought to give a legal opinion about whether the streets were public. Doc. 249, at 34. The court overruled that objection (Doc. 249, at 34), and that ruling is reviewed for abuse of discretion. See *United States* v. *Crabtree*, 878 F.3d 1274, 1287 (11th Cir. 2018). Now, Travis McMichael raises another objection not made below, contending that the Facebook post is hearsay as well. TM Br. 54-55. This unpreserved argument is reviewed for plain error. *United States* v. *Campbell*, 223 F.3d 1286, 1288 (11th Cir. 2000), cert. denied, 534 U.S. 829 (2001).

Under either standard of review, the challenge fails. First, the district court correctly ruled that the discussion among homeowners about whether to privatize their streets was circumstantial corroborating evidence, not a legal opinion about whether the streets were public, and this rationale would overcome a hearsay objection as well. See *United States* v. *Jiminez*, 564 F.3d 1280, 1287 (11th Cir. 2009); see also Fed. R. Evid. 801(c). Second, this evidence did not affect Travis McMichael's substantial rights. This Court will not reverse a conviction based on an evidentiary error unless that error was so prejudicial that it affected the outcome of the district court proceedings. See *Campbell*, 223 F.3d at 1288.

Here, "the jury had more than enough evidence to convict" even without the challenged evidence. *United States* v. *Lewis*, 40 F.4th 1229, 1246 (11th Cir. 2022) (declining to decide whether the district court erred in suppressing evidence because any error would be harmless). The jury heard extensive testimony from a Glynn County official, who authenticated copious records from the County about the streets of Satilla Shores. Doc. 250, at 160, 184, 182, 184; GXs 104-106. The jury could reasonably rely on that unchallenged evidence to conclude that the County provided or administered the streets of Satilla Shores. Thus, the Facebook

post's admission did not affect Travis McMichael's substantial rights, and his conviction for violating Section 245(b)(2)(B) should be affirmed.[8]

## II

### THE JURY REASONABLY CONVICTED DEFENDANTS OF ATTEMPTED KIDNAPPING

This Court should likewise reject defendants' arguments that the jury lacked sufficient evidence to find them guilty of attempted kidnapping. TM Br. 60-66; GM Br. 19-23; WB Br. 27. Under the kidnapping statute, the government had to show that each defendant, either independently or aiding and abetting another:

(1)   attempted to unlawfully seize or confine Arbery;

(2)   did so "for ransom or reward or otherwise"; and

(3)   used an instrumentality of interstate commerce "in committing or in furtherance of" the offense.

18 U.S.C. 1201(a)(1) and (d); Doc. 216, at 23 (jury instructions); *United States* v. *Adams*, 83 F.3d 1371, 1372 (11th Cir.), cert. denied, 519 U.S. 973 (1996).

Defendants do not challenge the first element. Rather, they argue that even if they tried to unlawfully confine Arbery, the government did not sufficiently prove that they did so to obtain a benefit (WB Br. 27; GM Br. 19-21) or by using

---

[8]   Because the jury reasonably convicted Travis McMichael of the hate-crime charge in Count 1, his challenge to the firearms offense in Count 4 necessarily fails because his only argument to vacate Count 4 is that he should not have been convicted of the underlying offense in Count 1. TM Br. 25.

an instrumentality of interstate commerce (GM Br. 21-23; TM Br. 60-66). This table summarizes the specific challenges each defendant raises:

| Elements of 18 U.S.C. 1201(a)(1) and (d) | Travis McMichael | Gregory McMichael | William Bryan |
|---|---|---|---|
| 1. *Attempted to unlawfully seize or confine Arbery;* | Unchallenged | Unchallenged | Unchallenged |
| 2. *Acted "for ransom or reward or otherwise;"* and | Sufficiency | Sufficiency | Sufficiency |
| 3. *Used an instrumentality of interstate commerce.* | Sufficiency and evidentiary | Sufficiency | Unchallenged |

As explained below, the challenges to the second element fail because a jury could find beyond a reasonable doubt that each defendant (independently or aiding and abetting another) attempted to detain Arbery to secure a benefit—namely, their own personal satisfaction of catching a Black man they assumed to be a criminal, or even just a reputational boost for being the neighborhood sentinels who caught a criminal. Likewise, on the third element, the jury could find beyond a reasonable doubt that the defendants aided and abetted one another using their trucks, which are instrumentalities of interstate commerce.

A. *The Jury Reasonably Concluded That Defendants Attempted To Kidnap Arbery For A Benefit*

This Court should reject defendants' sufficiency challenge to the second element of the attempted kidnapping charge, which required the government to prove that they attempted to kidnap Arbery "for ransom or reward or otherwise."

18 U.S.C. 1201(a).[9]  Defendants contend that this phrase, commonly called "the benefits clause," means that the government needed to prove that they acted to secure some sort of *tangible benefit* when they attempted to detain Arbery.  GM Br. 19-20; WB Br. 27.  Not so.

1.  Soon after Congress enacted the benefits clause, the Supreme Court unanimously rejected the argument that the clause required a tangible benefit to the defendant.  See *Gooch* v. *United States*, 297 U.S. 124, 128 (1936).  In *Gooch*, the Court explained that Congress added "or otherwise" to the kidnapping statute precisely to cover situations where the "captor might secure some benefit to himself," not just a ransom or reward.  *Ibid.*  To illustrate the statute's broad scope, the Court observed that the benefits clause would be satisfied when a person is motivated by affectionate feelings to kidnap another.  *Id.* at 129.

---

[9]  Travis McMichael does not discuss this argument in his appellate brief beyond adopting the argument of the other defendants.  TM Br. x.  This Court may thus decline to consider his challenge because sufficiency arguments such as this one "are too individualized to be generally adopted."  *United States* v. *Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) (quoting *United States* v. *Davis*, 61 F.3d 291, 296 n. 2 (5th Cir. 1995)).  Additionally, although Travis and Gregory McMichael made this argument in their Rule 29 motions, Bryan did not.  Doc. 251, at 134-135.  Thus, Bryan faces "a somewhat heavier burden" because when a sufficiency argument is not made below, the Court will reverse a conviction only if "necessary to prevent a manifest miscarriage of justice."  *United States* v. *Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013) (quoting *United States* v. *Greer*, 440 F.3d 1267, 1271 (11th Cir. 2006)).  Bryan made no such showing here.

This Court, too, has long highlighted the sweeping coverage of the benefits clause: "the prosecution need only establish that the defendant acted 'for *any* reason which would in *any* way be of benefit.'" *United States* v. *Lewis*, 115 F.3d 1531, 1536 (11th Cir. 1997) (quoting *United States* v. *Childress*, 26 F.3d 498, 503 (4th Cir. 1994)). In *Lewis*, this Court affirmed a conviction where the captor kidnapped his victim for companionship. *Ibid.* In another case, this Court held that kidnapping to satisfy the captor's sexual gratification qualifies. See *United States* v. *Miers*, 686 F. App'x 838, 844 (11th Cir. 2017). Put simply, "almost any purpose satisfies the § 1201 requirement of kidnapping for a benefit." *United States* v. *Duncan*, 855 F.2d 1528, 1534 (11th Cir. 1988).

Other circuits agree that the benefits clause covers kidnapping motivated by personal feelings or for almost any other reason. For example, the Fourth Circuit upheld the kidnapping convictions of Ku Klux Klansmen who kidnapped a couple, flogged them, and ordered them to attend church—emphatically rejecting the Klansmen's arguments that their actions did not satisfy the benefits clause. See *Brooks* v. *United States*, 199 F.2d 336, 336 (4th Cir. 1952). Similarly, the Third Circuit upheld a kidnapping conviction of a detective who tried to enhance his reputation by obtaining a confession from a suspect whom he illegally detained. See *United States* v. *Parker*, 103 F.2d 857, 861 (3d Cir. 1939). As these and other cases confirm, the government need only show that the defendant kidnapped

someone "for some purpose of his own." *United States* v. *Melton*, 883 F.2d 336, 338 (5th Cir. 1989).

2. Here, the jury had ample evidence to conclude beyond a reasonable doubt that defendants attempted to kidnap Arbery for their own purposes—mainly, to fulfill their sense of vigilante justice and to boost their reputation as neighborhood crime-stoppers:

- Travis McMichael referred to thieves as "vermin" and "savages" and wrote about the need to "make an example out of somebody," stating that if Black "savages" attacked his family, "I would beat those monkeys to death" and "have the same remorse putting them down as I would with a rabid coon" (GXs 41, 43, 43.2, 44.2);

- Travis McMichael responded to a Facebook post of someone being shot after a home-invasion robbery by stating, "I keep my home shotgun loaded with high brass #5's. it will rip someone to shreds" (GXs 45.1, 45.2);

- Travis McMichael responded with two words to a Facebook post about thefts from cars in the neighborhood: "Arm up" (GX 64);

- Bryan once responded to a Facebook post about a bike being stolen in the neighborhood by pinning blame on a Black person while using a racial slur: "My money is still on boot lip" (GX 63); and

- Gregory McMichael wrote about what he would do if he caught a thief ("Woe be unto the sticky-fingered bastard") (GX 53), and shared memes on social media like these:




(GXs 50, 51);

- All three defendants used hate-filled language to refer to Black people (Doc. 249, at 49, 56-58, 60-61, 79, 96-98, 100; Doc. 251, at 127; GXs 38, 42, 42.1, 56-58, 61, 62).

The above evidence creates a reasonable inference that defendants wanted to take the law into their own hands and catch a Black man they assumed to be a criminal. Or that they wanted to be the heroes of the neighborhood by tackling crime. Or that they simply hoped to gain some personal satisfaction by inflicting violence on a Black man. No matter which explanation it is, the jury's verdict is reasonable: the defendants "intended to gain some benefit" when they attempted to seize and detain Arbery. Doc. 216, at 23.

3. Bryan's arguments fail for another reason: because he was charged with aiding and abetting the McMichaels, the jury did not need to find that he acted to secure a benefit. To violate the aiding and abetting statute, a person must "(1)

take[] an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond* v. *United States*, 572 U.S. 65, 71 (2014). That is it. "[A] defendant need not participate in every element of the crime" to be guilty of aiding and abetting. *United States* v. *Roosevelt Coats*, 8 F.4th 1228, 1248 (11th Cir. 2021). As the jury instructions explained, the evidence need only show "beyond a reasonable doubt that a charged defendant was a willful participant in the crime, and not merely a knowing spectator." Doc. 216, at 25.

Here, Bryan was no mere spectator: he called out to the McMichaels, "Y'all got him?" and then aggressively drove his pickup truck to help them corral Arbery. Doc. 250, at 232; Doc. 248, at 153-158. Indeed, Bryan does not challenge that he tried to illegally detain Arbery. Thus, even if Bryan did not act "for ransom or reward or otherwise," the jury still reasonably found him guilty because he actively participated in the crime through his "words, acts, encouragement, support, or presence," and "with full knowledge of the circumstances." *Roosevelt Coats*, 8 F.4th at 1248 (citation omitted). Especially when viewing the evidence in the light most favorable to the verdict and drawing all inferences in favor of that verdict, this Court should not disturb the verdict that defendants, either independently or aiding or abetting one another, acted to secure a benefit.

B.  *The Jury Reasonably Concluded That Defendants Attempted To Kidnap Arbery Using Instrumentalities Of Interstate Commerce*

This Court should also reject Travis and Gregory McMichael's sufficiency challenge to the final element of the attempted kidnapping offense:  whether defendants used an "instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense," as 18 U.S.C. 1201(a)(1) requires.  TM Br. 60-66; GM Br. 21-23.  Here, the evidence showed that the McMichaels and Bryan aided and abetted one another by using their trucks to chase and trap Arbery—"like a rat," in Gregory McMichael's words.  GX 27.34.

The McMichaels primarily argue that the government's evidence was not enough because, in their view, the government also needed to prove that the trucks were "moving in interstate commerce" when the attempted kidnapping occurred. TM Br. 65.  They are wrong, and courts have unanimously rejected this legal argument in other kidnapping cases.  See *United States* v. *Protho*, 41 F.4th 812, 828 (7th Cir.) (collecting cases), cert. denied, 143 S. Ct. 465 (2022).  This Court should likewise conclude that the facts here amply show that defendants used their trucks during and in furtherance of the attempted kidnapping.

1.  *The Kidnapping Statute Is Satisfied By An Intrastate Use Of An Instrumentality Of Interstate Commerce*

To begin, the Commerce Clause empowers Congress to regulate purely intrastate activities when those activities involve instrumentalities of interstate

commerce. See *United States* v. *Lopez*, 514 U.S. 549, 558 (1995).

Instrumentalities of interstate commerce "are the people and things themselves

moving in commerce, including automobiles." *United States* v. *Ballinger*, 395

F.3d 1218, 1226 (11th Cir.) (en banc), cert. denied, 546 U.S. 829 (2005). As this

Court explained in *Ballinger*, Congress's authority to regulate instrumentalities of

interstate commerce like automobiles "includes the power to prohibit their use for

harmful purposes, even if the targeted harm itself occurs outside the flow of

commerce and is purely local in nature." *Ibid.*

Take cell phones, for example. "Telephones and cellular telephones are

instrumentalities of interstate commerce," and their use in a crime satisfies the

Commerce Clause even when the defendant makes only local phone calls. *United

States* v. *Evans*, 476 F.3d 1176, 1180 (11th Cir.) (affirming conviction under

18 U.S.C. 2422(b)), cert. denied, 552 U.S. 878 (2007). In fact, this Court has held

that using a cell phone during a kidnapping satisfies Section 1201's jurisdictional

element even without evidence that the calls were routed through interstate

commerce. See *United States* v. *McKinley*, 647 F. App'x 957, 962 (11th Cir.),

cert. denied, 137 S. Ct. 513 (2016). Cars and trucks are no different. As *Ballinger*

recognized, automobiles qualify as instrumentalities of interstate commerce, and

Congress may criminalize harmful uses of them regardless of whether the crime

itself involved interstate commerce. 395 F.3d at 1226.

Other circuits agree that in a kidnapping case, the government need only prove that a defendant used a car during the offense. The Seventh Circuit, for example, upheld a kidnapping conviction of a man who grabbed a child off the sidewalk, drove a short distance, and assaulted her in his car, rejecting the defendant's argument that the government also needed to prove that his car moved in interstate commerce. See *Protho*, 41 F.4th at 828. As the Seventh Circuit explained, the Commerce Clause turns on "the *nature* of the regulated object's class (here, automobiles) rather than the particular *use* of one member of that class (Protho's Ford Explorer)." *Ibid.*

Agreeing with *Protho*, the Sixth Circuit also upheld a kidnapping conviction where the defendant used his car entirely intrastate to commit the offense. See *United States* v. *Windham*, 53 F.4th 1006, 1013 (6th Cir. 2022). In that case, the court reasoned that "the federal kidnapping statute refers to instrumentalities '*of* interstate or foreign commerce,'" with no requirement that those instrumentalities be used *in* interstate commerce. *Ibid.* (quoting 18 U.S.C. 1201(a)(1)). Thus, when a kidnapper uses his car "in committing or in furtherance of" a kidnapping, the federal kidnapping statute applies even if that car were not driven out of state. *Ibid.*

To be sure, as defendants point out (TM Br. 63-64), this Court once declined to decide whether cars are per se instrumentalities of interstate commerce. See

*Garcia* v. *Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1250 (11th Cir. 2008) (noting that such a ruling might allow Congress to regulate "quintessentially state law matters" like traffic rules), cert. denied, 555 U.S. 1174 (2009). But unlike *Garcia*, which involved preemption of state tort law, the current appeals do not require the Court to announce a new rule that could expand the Commerce Clause's reach. Rather, this Court's en banc opinion in *Ballinger* already recognizes that Congress may criminalize using instrumentalities of interstate commerce "to facilitate harmful acts, which may be consummated—and whose effects ultimately may be felt—outside the flow of commerce."[10] *Ballinger*, 395 F.3d at 1228. Accordingly, this Court should reject defendants' unsupported legal arguments.

## 2. *Defendants Used Instrumentalities Of Interstate Commerce—Their Trucks—To Commit The Crime*

Viewed under the correct legal standard, the jury could and did reasonably conclude that defendants used instrumentalities of interstate commerce—their trucks—when they committed the crime. As the district court spelled out, the evidence "plainly showed" that the McMichaels used their truck "to chase Arbery

---

[10] Gregory McMichael mistakenly quotes the en banc court in *Ballinger* as declining to rule "that all methods of transportation and communication are per se instrumentalities of interstate commerce even when they are not used in commerce." GM Br. 22. That quote is from the panel decision in *Garcia*, 540 F.3d at 1250.

through the Satilla Shores neighborhood, block his path, and trap him." Doc. 257, at 26. And although Bryan does not challenge the government's proof on this element, his actions are still relevant because the indictment charged that all three defendants aided and abetted one another. Doc. 1, at 4.

Here, defendants drove their trucks through the streets while pursuing Arbery, repeatedly demanding that he stop and ultimately threatening to shoot him if he did not. Ignoring this evidence, defendants focus only on the last moments of Arbery's life, *after* they trapped him. GM Br. 22; TM Br. 65. At this point, according to defendants, their trucks simply served as a "barricade." GM Br. 9; TM Br. 64. But the trucks did not magically appear "parked" in the street. TM Br. 65. Defendants *drove* them there. And while *driving*, they chased Arbery relentlessly, trying to trap him. So this case is not like using a telephone cord to "tie up a victim" (GM Br. 22) or using a rotary phone to "bludgeon someone" (TM Br. 65). Defendants used their trucks exactly how trucks are supposed to be used, by *driving* them. In so doing, they stalked Arbery similarly to would-be kidnappers using a car to pursue an innocent victim walking down the street. Based on this evidence, the jury permissibly could and did conclude that defendants used an instrumentality of interstate commerce during the offense.

C.     *Travis McMichael's Evidentiary Challenge Does Not Warrant Reversal*

Travis McMichael also challenges his attempted kidnapping conviction by raising an evidentiary objection (TM Br. 56-60), quibbling over typos on two similar affidavits discussed by a government witness.  GXs 128-129; Doc. 251, at 91-95.  Notably, Travis McMichael does not challenge the substance of the records and related testimony (that his and Bryan's trucks were manufactured outside Georgia), nor does he contest the district court's ruling that the evidence qualified as business records under Federal Rule of Evidence 803(6).  Doc. 251, at 119-120.  Instead, he contends that the evidence should have been thrown out based on a technicality:  the affidavits introduced to authenticate the records were dated five days in the future.  TM Br. 60.  This argument fails because (1) the district court did not abuse its discretion by ruling that the incorrect date was "a scrivener's error" (Doc. 251, at 119-120), and (2) the court's ruling did not affect any substantial right.

1.  Travis McMichael cannot show that the district court abused its discretion.  See *United States* v. *Crabtree*, 878 F.3d 1274, 1287 (11th Cir. 2018).  Under this standard, Travis McMichael must show that the decision was "manifestly erroneous."  *United States* v. *Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1063 (2005).  He fails to meet his heavy burden when his sole objection is that the authenticating affidavits contained the

wrong date on the signature line. He also does not show any prejudice or explain how the jury could have been confused by this. Especially considering that he does not dispute that his and Bryan's trucks were manufactured outside Georgia, which is what the records were used to prove, Travis McMichael has not shown that the district court abused its discretion by admitting those documents.

In analogous situations, this Court has routinely rejected attempts by defendants to procure relief based on obvious typos. For example, when a typo appears on a judgment, this Court does not acquit the defendant, it remands the case for the district court to correct the mistake. See, *e.g.*, *United States* v. *Carrasquillo*, 4 F.4th 1265, 1274 (11th Cir. 2021). Likewise, when an indictment contains a typo listing the incorrect year of an offense, this Court does not reverse a conviction, at least when the mistake does not prejudice the defendant. See *United States* v. *Roberts*, 308 F.3d 1147, 1156 (11th Cir. 2002), cert. denied, 538 U.S. 1064 (2003). And when a search warrant's supporting affidavit contains a typo but otherwise establishes probable cause, this Court affirms the warrant's validity. See *United States* v. *Snyder*, 471 F. App'x 884, 886 (11th Cir.), cert. denied, 568 U.S. 956 (2012). So the district court here made no error, much less a manifest one, by admitting records authenticated by affidavits that contained an obvious typo in the date they were signed.

2.  Travis McMichael's challenge also fails because "the jury had more than enough evidence to convict" even without the challenged evidence. *United States* v. *Lewis*, 40 F.4th 1229, 1246 (11th Cir. 2022) (declining to decide whether the district court erred in suppressing evidence because any error would be harmless). As this Court has stated, potential "errors that do not 'affect substantial rights must be disregarded.'" *Frazier*, 387 F.3d at 1266 n.20 (quoting Fed. R. Crim. P. 52(a)). That is the case here.

The challenged affidavits and related testimony are inconsequential because the government was not required to prove that the trucks were manufactured out of state to establish the instrumentality-of-commerce element.  Courts have repeatedly upheld kidnapping convictions when a defendant has used an instrumentality of interstate commerce to commit the offense—even without a showing that the vehicle moved in interstate commerce or the offense itself affected interstate commerce.  See, *e.g.*, *Protho*, 41 F.4th at 828.  So in the end, the jury did not need evidence that defendants' trucks once crossed state lines, as the challenged evidence proved.  The jury already had all the evidence it needed to determine beyond a reasonable doubt that defendants used an instrumentality of interstate commerce during the offense.  This Court should thus affirm the convictions for attempted kidnapping.

## CONCLUSION

For the foregoing reasons, this Court should affirm defendants' convictions.

Respectfully submitted,

JILL E. STEINBERG
   United States Attorney

TARA M. LYONS
First Assistant United States Attorney

KRISTEN CLARKE
   Assistant Attorney General

s/ Brant S. Levine
ERIN H. FLYNN
BRANT S. LEVINE
   Attorneys
   Department of Justice
   Civil Rights Division
   Appellate Section
   Ben Franklin Station
   P.O. Box 14403
   Washington, D.C.  20044-4403
   (202) 616-4373
   Brant.Levine@usdoj.gov

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g):

1.  This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 12,785 words.

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman, 14-point font.

s/ Brant S. Levine
BRANT S. LEVINE
 Attorney

Date:  June 2, 2023