IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 22-12792-D

_____

UNITED STATES OF AMERICA,

Appellee,

v.

TRAVIS MCMICHAEL,

Appellant.

_____

**REPLY BRIEF**

_____

Amy Lee Copeland
Georgia Bar No. 186730
Rouse + Copeland LLC
602 Montgomery Street
Savannah, Georgia 31401
(912) 807-5000

Attorney for Appellant

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| vs. | ) | No. 22-12792-D |
| | ) | |
| TRAVIS MCMICHAEL, | ) | |
| | ) | |
| Appellant. | ) | |

## CERTIFICATE OF INTERESTED PERSONS

As required by 11th Cir. Rule 26-1, Appellant Travis McMichael files his certificate of interested persons as follows:

Arbery, Ahmaud

Balbo, Attilio Joseph

Balbo & Gregg, Attorneys at Law, PC

Bernstein, Barbara (Bobbi)

Bryan, William "Roddie"

Cheesbro, Honorable Benjamin W.

Copeland, Amy Lee

C-1 of 2

*United States v. McMichael*, No. 22-12792-D

J. Pete Theodocion, PC

Lyons, Tara M.

McMichael, Gregory

McMichael, Travis

Perras, Christopher J.

Rouse + Copeland, LLC

Steinberg, Jill

Theodocion, James Pete

Wood, Honorable Lisa G.

There are no publicly traded corporations to disclose.

This 24th day of July, 2023.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

Rouse + Copeland, LLC
602 Montgomery Street
Savannah, Georgia 31401
912-807-5000
912-335-3440 (fax)
ALC@roco.pro

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................... C-1

TABLE OF CONTENTS ............................................................... i

TABLE OF CITATIONS .............................................................. ii

ARGUMENT AND CITATION OF AUTHORITY ................................... 1

    1. The government did not prove beyond a reasonable doubt that Glynn County "provided or administered" the streets of Satilla Shores neighborhood, meaning that insufficient evidence supports the jury's verdict on the 18 U.S.C. §245(b) and 18 U.S.C. §924(c) convictions ............................................................ 1

    2. Admission of the neighbors' Facebook post was erroneous, and it mattered. ................................................................. 16

    3. Admission of the faulty affidavit to prove the interstate commerce nexus was erroneous, and it mattered. .................... 20

    4. The government did not prove that McMichael used an instrumentality of interstate commerce as required by the attempted kidnaping statute ................................................... 23

CERTIFICATE OF COMPLIANCE ........................................................ 27

CERTIFICATE OF SERVICE ............................................................... 28

# TABLE OF CITATIONS

## Cases

*Burke County v. Akin*, 291 Ga. 697 (2012)...............................................15

*High Point, LLP v. Nat'l Park Serv.*, 850 F.3d 1185 (11th Cir. 2017).....11

*Morris v. Sumter Cnty.,* 365 Ga. App. 323 (2022), reconsideration denied (Sept. 15, 2022), cert. granted May 16, 2023...........................................7

*Reyes v. North Texas Tollway Auth.*, 861 F.3d 558 (5th Cir. 2017).........11

*Taylor v. United States,* 579 U.S. 301 (2016)...........................................1

*United States v. Ballinger*, 395 F.3d 1218 (11th Cir. 2005)...................20

*United States v. Carrasquillo*, 4 F.4th 1265 (11th Cir. 2021)...................22

*United States v. Cazares*, 788 F.3d 956 (9th Cir. 2015)...........................8

*United States v. Clarke*, 822 F.3d 1213 (11th Cir. 2016)..........................7

*Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242 (11th Cir. 2008) ................................................................................................20

*United States v. Griffin,* 585 F. Supp. 1439 (M.D.N.C. 1983)......9, 11, 15

*United States v. Jimenez*, 564 F.3d 1280 (11th Cir. 2009) ........................6

*United States v. Mungia*, 114 F.3d 1181 (5th Cir. Apr. 7, 1997)(unpub.) .8

*United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002)...............................8

*United States v. Protho*, 41 F. 4th 812 (7th Cir.), *cert. denied*, ___ U.S.
___, 143 S. Ct. 465 (2022) ................................................................24-25

*United States v. Reed*, 941 F.3d 1018 (11th Cir. 2019)............................ 20

*United States v. Roberts,* 308 F.3d 1147 (11th Cir. 2002) ....................... 22

*United States v. Small*, 988 F.3d 241 (6th Cir. 2021)............................... 26

*United States v. Snyder*, 471 Fed. Appx. 884 (11th Cir. 2012)............... 22

*United States v. Vonn*, 535 U.S. 55 (2002).............................................. 19

*United States v. White*, 846 F.2d 678 (11th Cir. 1988) ........................... 8-9

*United States v. Windham*, 53 F. 4th 1006 (6th Cir. 2022) ................. 25-26

**United States v. Windham*, 53 F. 4th 1006 (6th Cir. 2022) ................. 25-26*

*\*Wooden v. United States*, ___ U.S. ___, 142 S. Ct. 1063 (2022) ............ 10

## Statutes

18 U.S.C. §245(a)................................................................................... 1

18 U.S.C. §245(b)................................................................................... 1

18 U.S.C. §245(b)(1)(B)......................................................................... 10

18 U.S.C. §924(c) ................................................................................... 1

18 U.S.C. §1201(a)(1), (d) ...................................................................... 23

O.C.G.A. §45-6-5.................................................................................... 6

O.C.G.A. §32-1-3(24)............................................................................. 15

## **Rules**

Fed. R. App. P. 32(a)(5) ............................................................27

Fed. R. App. P. 32(a)(6) ............................................................27

Fed. R. App. P. 32(a)(7)(B)(ii) ..................................................27

Fed. R. App. P. 32(f) .................................................................27

## **Other**

Webster's Third International Dictionary 1827 (1968) .........................10

## ARGUMENT AND CITATION OF AUTHORITY

A fundamental principle of criminal law is that the government always bears the burden of proving beyond a reasonable doubt each element of a crime, including any statutory jurisdictional hook. *E.g., Taylor v. United States*, 579 U.S. 301, 308 (2016). That is true for 18 U.S.C. §245(a), the hate crimes statute, and 18 U.S.C. §1201, the kidnaping statute. Appellant Travis McMichael now responds to the government's arguments on this appeal.

1. **The government did not prove beyond a reasonable doubt that Glynn County "provided or administered" the streets of Satilla Shores neighborhood, meaning that insufficient evidence supports the jury's verdict on the 18 U.S.C. §245(b) and 18 U.S.C. §924(c) convictions.**

To prove a violation of the interference with rights statute, the government must prove beyond a reasonable doubt (among other things) that the prohibited act occurred because a person – here, Ahmaud Arbery – was or had been "participating in or enjoying any . . . facility . . . provided or administered by any State or subdivision thereof." 18 U.S.C. §245(b). The indictment identified the facility as a "public street in the Satilla Shores neighborhood of Brunswick, Georgia. . . ." (Doc 1-Pg 1)

To prove its case, the government called a single witness: Tony Vicent, the roads and drainage division manager for the Glynn County Department of Public Workers ("DPW"). (Doc 250-Pgs 141-42, TR 1511-12) His primary responsibilities were "to keep the public rights-of-ways for people to drive on and to maintain drainage throughout Glynn County." (*Id.*) As part of its case, the government introduced through Vicent exhibit 103, a subdivision plat for Satilla Shores. (Doc 250-Pgs 153-60, TR 1523-30) It then asked Vicent to read aloud a dedication on the plat:

> We the undersigned owners of the area in the 27th [GM District] Glynn County, Georgia shown and subdivided on this plat do hereby dedicate to the use of the public forever all streets, ways, alleys, et cetera, as shown on said plat. In witness whereof the said owners have caused dedication to be executed this 17th day of January 1958.

(*Id.* at 159-60, TR 1529-30)

> In closing, the government made this argument:

> As you learned from the evidence in this case, the streets in Satilla Shores are public streets maintained by Glynn County, specifically the Glynn County Department of Public Works. Let's review that evidence.

> We will start with the public land records from the 1950's that established the Satilla Shores neighborhood. Read what's written at the bottom of the screen.

"We," some language, "do hereby dedicate to the use of the public forever all streets, ways, alleys, et cetera, as shown on said plat."

The streets of the Satilla Shores neighborhoods were dedicated for public use from the very beginning . . . .

(Doc 252-Pgs 34-35, TR 1866-67)

The government introduced this evidence and made this argument at trial. It attempts on appeal to avoid the legal consequences of the evidence it introduced and the argument it made. Specifically, the Glynn County Commission approved that very plat as to "elevation and drainage of the area involved *but expressly excluded the acceptance of dedication at this time of any and all dedications [of] streets* or ways . . . ." (Doc 250-Pg 282-83, TR 1537, DX 13)(emphasis added) Vicent acknowledged that DPW answered to the County Commission, which had the ultimate authority. (Doc 250-Pg 165, TR 1535)

The government introduced no evidence – none – showing that the County Commission later accepted the express dedication of the streets that it that rejected. The developer, not the County, paved the streets of Satilla Shores. (Doc 250-Pg 164, TR 1534; Doc 257-Pg 11) And Vicent agreed that a street (what was alleged in the indictment) differed from a right-of-way: A right-of-way is broader than a street and encompasses

the sidewalks and drainage easements on each side of the street. (Doc 250-Pgs 163-64, TR 1533-34) As reflected in its rejection of the dedication of the streets of Satilla Shores, the County agreed to accept only drainage and elevation, which are parts of the right-of-way. McMichael argued in his principal brief that "[t]o broaden the analysis now to 'right of way' would amount to a constructive indictment of the indictment." (Br. of Appellant at 45) The government never addresses this point.

In any event, the County's service records showed that ditches and elevation are, in fact, what the County maintained. As McMichael explained in his principal brief, the 101 service tickets that the government introduced at trial went overwhelmingly to drainage, ditches, and mosquitoes. (Br. of Appellant at 9-13) The only asphalt repairs came in conjunction with drainage work. (GX 105-058, 105-067-070) The only ostensible road-related work on the three relevant streets – Satilla, Holmes, and Burford[1] – over the 14-year period captured by the 101 service tickets was 1) promising a street sweeper visit to Satilla

---

[1] There is a fourth street in Satilla Shores – Zellwood. The government seemingly abandoned a claim that Zellwood was "provided or administered" by Glynn County. (Doc 233-Pg 5)

Drive in April 2019 (GX 105-094) and 2) contacting a garbage company about a hyrdraulic spill from its truck (GX 105-057).

In its exhibit 106, the government introduced largely undated, unpaginated fragments of County Commission minutes. As McMichael detailed at pages 13-18 of his principal brief, Vicent had no personal knowledge about any of the minutes or whether anything was actually done in Satilla Shores. (Doc 250-Pgs 184-89, TR 1554-59) Vicent recalled no specific work at Satilla Shores and could offer only that the roads were "paved now." (Doc 265-Pg 186-87, TR 1556-57) Those minutes included the County Commission's refusal to install streetlights in Satilla Shores. (Doc 250-Pg 187, TR 1557; GX 106-007) Its service tickets included a refusal to install speed bumps. (Doc 250-Pg 172, TR 1542; GX 105-072)

Why does this matter? The government twice contends that title – or formal title – to streets is not required under §245. (Br. of Appellee at 36)("They contend that Section 245 requires proof – under state property law – that a public entity holds proper title to land" and "nothing else in the statute's text requires the County to have formal title under state law") To be fair, McMichael uses the word "title" in his

5

brief only once, when quoting the district court's order. (Br. of Appellant at 26)(quoting Doc 257-Pg 8) McMichael's contention instead is that the *legal effect* of the County's unrefuted rejection of the developer's attempted dedication of the streets means that the County expressly accepted no duties and obligations with respect to those streets. As McMichael put it in his brief, his argument is "that the County expressly rejected the obligation to care for the *streets* of Satilla Shores neighborhood, although it accepted (either expressly or impliedly) the obligation to care for drainage and elevation." (Br. of Appellant at 26)(emphasis in original)

And that's where McMichael's property analysis comes in. McMichael cited Supreme Court precedent to the effect that "[p]roperty rights are 'creatures of state law.'" (Brief of Appellant at 31-32) The government does not address this contention. McMichael argued that the DPW's 2021 list of public streets and Vicent's statements that the three Satilla Shores roads were public "could not countermand the County Commission's rejection and show implied acceptance in 2020." (Br. of Appellant at 43) McMichael cited a state case and a Georgia statute, O.C.G.A. §45-6-5, demonstrating that the list and those

statements could not bind the County. (*Id.*) The government does not

address this contention, either. McMichael cited cases about how

"[p]lacement on the list was not enough," how counties can "accept part

of a dedication and reject another part," and the "level of the public

authority's involvement required to show an implied acceptance of an

offer of dedication." (Br. of Appellant at 39, 44-45) The government

ignores these cases, most of which are from the Georgia Supreme Court.

*E.g., United States v. Clarke*, 822 F.3d 1213, 1217 (11th Cir. 2016)

(observing that "in matters of state law, federal courts are bound by the

rulings of the state's highest court," turning only to an intermediate

state appellate court if the state's highest court has not ruled on the

issue).

The government instead offers this:

As Georgia courts have held, even when county officials repeatedly
reject a public land dedication, "public use is sufficient to complete
the dedication." *Morris v. Sumter Cnty.*, 365 Ga. App. 323, 328,
878 S.E.2d 81, 87 (2022)(citation omitted), reconsideration denied
(Sept. 15, 2022).

(Br. of Appellee at 40) What the government fails to tell the Court is

that the Georgia Supreme Court granted certiorari in *Morris* on May

16, 2023 – 16 days before the government filed its brief.

The government asserts that "Section 245's list of protected rights includes public streets." (Br. of Appellee at 35) McMichael acknowledged that "[a] handful of cases have summarily concluded, with no discussion of 'provide or administer,' that public streets can be a 'facility in §245." (Br. of Appellant at 28) As did McMichael, the government cites *United States v. Nelson*, 277 F.3d 164, 192-93 (2d Cir. 2002), a case involving a "Brooklyn city street." The government adds *United States v. Mungia*, 114 F.3d 1181, 1997 WL 256701 (5th Cir. Apr. 7, 1997)(unpub.), a four-paragraph unpublished opinion that refers to "the streets and sidewalks of Lubbock," and *United States v. Cazares*, 788 F.3d 956, 990 (9th Cir. 2015), which refers to Avenue 52 in Los Angeles. (Br. of Appellee at 35) Neither *Mungia* nor *Cazares* address what it means to "administer or provide" under §245.[2]

---

[2] The government describes one of the parade cases, *United States v. White*, 846 F.2d 678, 695 & n. 27 (11th Cir. 1988), as "noting that 'the city provided the streets on which the demonstrators marched' as an alternative basis to uphold a guilty verdict on Section 245 charges." (Br. of Appellee at 35) This may be a generous reading of Footnote 27. Nonetheless, while *White* does not describe the streets involved in the parade, the implication is that they are city streets, not neighborhood streets.

After acknowledging that streets can be facilities, McMichael addressed the only two cases – *United States v. White,* 846 F.2d 678 (11th Cir. 1988), and *United States v. Griffin,* 585 F. Supp. 1439 (M.D.N.C. 1983) – that discuss what it means to "provide or administer" under §245. (Br. of Appellant at 29-31) *White* and *Griffin*, both of which arose in the context of parades, considered how each city obligated itself via local ordinance in parades and civil right demonstrations, and how that obligation showed the city's administration. *White*, 846 F.2d at 694; *Griffin*, 585 F. Supp. at 1442. McMichael argued that these cases allow courts to look to "local regulations to answer the question of whether a political entity administered an activity under §245." (Br. of Appellant at 31) The government does not address this argument.[3] If *White* and *Griffin* look to local ordinances to consider whether a city administered a parade, the Court can look to the legal effect of a county's express rejection of an offer of dedication to determine whether it provided or administered neighborhood streets.

---

[3] The government does not cite *Griffin* at all. It cites *White* as discussed in the prior footnote, and mostly when it writes about the broad remedial purposes of §245. (Br. of Appellee at 21, 34, 37)

The government asks the Court to consider the ordinary meanings of "provided" and "administered," which it defines as (respectively) "to supply what is needed for sustenance or support" and "to manage the affairs of" or "to direct or superintend the execution, use, or conduct of." (Br. of Appellee at 36, *citing* Webster's Third New International Dictionary 1827 (1968)). It then points to the "broad remedial purpose of §245." (Br. of Appellee at 37)

McMichael discussed both points in his own brief. (Br. of Appellant at 49-52) In plain meaning analysis, the Supreme Court instructs courts to consider "how an ordinary person (a reporter; a police officer; yes, even a lawyer)" might describe something – "and how she would not." *Wooden v. United States*, ___ U.S. ___, 142 S. Ct. 1063 (2022). When asked who provided the streets of Satilla Shores, an ordinary person would answer "the developer," since it paved the roads. (Doc 250-Pg 164, TR 1534; Doc 257-Pg 11) To use the government's definition, the developer "suppl[ied] what is needed" for there to be roads in Satilla Shores.

McMichael detailed, too, how 18 U.S.C. §245(b)(1)(B) applies to a range of things: "any benefit, service, privilege, program, facility or

activity." (Br. of Appellant at 51) He noted that benefits, services, programs, and activities are a more natural fit for "administer" than streets; *Griffin*, 585 F. Supp. at 1445, found that a parade is an activity administered by the city. (Br. of Appellee at 51) Vicent, for instance, never used "administer" to describe what the DPW does.[4]

The government does not address these specific arguments. Instead, after advocating for the use of the "ordinary meanings" of "provide" and "administer" found in the dictionary, the government offers an entirely different (and combined) definition: "Provided or administered" means that a state or political subdivision "*maintain[ed]* the particular facility in a condition suitable for use." (Br. of Appellee at 36, 38)(emphasis added) After inventing an entirely new definition, the

---

[4] There are instances where courts have used "administer" in reference to roads. That usage encompasses things like toll roads and roads under the aegis of the Park Service, which administers land pursuant to an extensive regulatory scheme. *E.g., Reyes v. North Texas Tollway Auth.*, 861 F.3d 558, 559 (5th Cir. 2017)(noting the authority is a "regional agency established to administer toll roads in north Texas," which initially entailed "manned and gated" toll booths and now involves TollTag-Only lanes); *High Point, LLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1197 (11th Cir. 2017)(discussing Wilderness Act, 16 U.S.C. §1131(a), §1133(b), which provides that any wilderness area, there shall not be any temporary road "except as necessary to meet minimum requirements for the administration of the area").

government gives five examples that it says shows maintenance. (Br. of Appellee at 38)

Three of these examples (bullet points one, three, and four) are based on Vicent's testimony that the streets are public and maintained by the county or on the fact that they are on the DPW's list. (*Id.*) Again, McMichael cited case and statutory authority about why Vicent's testimony and the DPW's list cannot countermand the County Commission's explicit refusal to care for the roads. (Br. of Appellant at 43-44, 51) The government never addresses this argument.

The government's second bullet point is that

Glynn County has serviced roads in Satilla Shores over the years, regularly responding to residents' requests for service, including filling a gap in a curb with asphalt, cleaning up a spill from a trash truck, and remediating flooded roads. (Doc 250, at 150-151; GX 105, at 56, 67, 82)

(Br. of Appellee at 38) "[C]leaning up a spill from a trash truck" involved a Satilla Shores resident's calling DPW about a hydraulic spill from a garbage truck, which was remedied when DPW *called the private*

*garbage company*. (Doc 250-Pg 150, TR 1520; GX 105-057)[5] The other two incidents were part of drainage projects, whether repairing a curb after a drain repair or clearing ditch and storm drainpipes. (Doc 250-Pgs 149-50, 169-71, TR 1519-20, 1539-40; GX 105-082) Work incident to drainage projects, as McMichael argued, "show[s] the County's express or implied acceptance of the duty to maintain elevation and drainage" but do not show "any implied acceptance of that duty as to streets, which is what the indictment charged." (Br. of Appellant at 44-45) The government never responded to that argument, or to McMichael's point that drainage is on the right-of-way, not the streets.

Finally, the government states that "Glynn County Commission minutes show that the County accepted bids to pave roads in Satilla Shores (GX 106, at 1-3, 5-7)." (Br. of Appellee at 38) McMichael discussed these often undated, typically unpaginated, and usually incomplete minutes extensively in his principal brief. (Br. of Appellant at 13-18, 46-48) Rather than repeat those arguments, he relies on them

---

[5] DPW notified people to clean up the spill, which was done. (Doc 250-Pg 150, TR 1520; GX 105-057) Vicent did not testify that DPW cleaned up the spill, and the contact person on the service ticket was Republic Services, which held the garbage contract. (*Id*.)

here except to say this. Nothing in any of these minutes shows that work was actually done and paid for by the County, and the records are often unclear or silent about the scope of the work. Vicent had no personal knowledge "[o]ther than the records." (Doc 250-Pg 185-87, TR 1555-57) A complete record from the County Commission shows that it did not approve a request for streetlights at two neighborhood intersections. (GX106-007)

The government calls these few examples "obvious" and "copious" evidence that "Glynn County did indeed *maintain* the streets of Satilla Shores for public use." (Br. at Appellee at 38) It is not. That the streets were "in working order" of no moment. (Br. of Appellee at 39) It is undisputed that the neighborhood's developer paved the streets. (Doc 250-Pg 164, TR 1534; Doc 257-Pg 11) McMichael argued in his principal brief that

> the government adduced no evidence about the composition of the streets (whether concrete, asphalt, or other product) or how long neighborhood streets typically last. These things are not within the common knowledge or experiences of jurors. While the district court believed that the jury could reasonably infer that the County paved the streets from the "direct evidence that this work was called for and contemplated" (Doc 257-Pg 14), a "conviction must be supported by reasonable inferences, not mere speculation." *United States v. Rodriguez,* 732 F.3d 1299, 1303 (11th Cir. 2013). . .

14

(Br. of Appellant at 47) Other than dismissing this argument as "nitpick[ing]" (Br. of Appellee at 39), the government remains silent.

Finally, the government observes that the Georgia code defines "public road" to include a "road [or] street. . .that either is open to the public or has been acquired as right of way, and is intended to be used for enjoyment by the public and for the passage of vehicles." O.C.G.A. §32-1-3(24). (Br. of Appellee at 39) "Public road" is not the test under §245. To paraphrase the government's argument at an earlier point (Br. of Appellee at 36), Congress could have included "public road" in Section 245's definitions, but Congress did not. Even if a county expressly accepts a dedication of all streets in a subdivision by deed (which didn't happen here), it still retains the discretion "to leave certain of the roads therein unopened." *Burke County v. Akin*, 291 Ga. 697, 700 (2012). Being a "public road' under §32-1-3(24) does not necessarily mean that it is a road "provided or administered" by a county.

McMichael acknowledged §245's "broad remedial purpose," which included a statement in the legislative history that the act "was designed to protect someone traveling on an interstate highway." (Br. of Appellee at 49-50)(*citing Griffin*, 585 F. Supp. at 1445 & n. 1-2) But a

statute's broad remedial purpose does not relieve the government from proving its case. Federal jurisdiction is not limitless, and in this case, it did not extend to streets in a small neighborhood over which Glynn County expressly rejected responsibility.

### 2. Admission of the neighbors' Facebook post was erroneous, and it mattered.

Here is government's exhibit 67:



Facebook Business Record                                    Page 245

subdivision to be in agreement to form a Homeowners Association. There is benefit to that - most property values increase when an HOA exists. An attorney could put it together for you - then work with the county ordinances which would require a legal agreement that the county would abandon the property OR there are other ways - such as a legal agreement with the county to allow the residents use of the right of way to do something like, put up entry gates to the community. But - you would still need an attorney's assistance to give access to 911/EMS, trash service, etc. Anything is possible. 🙂😉

**Time** 2020-05-15 21:37:47 UTC

**User** N.T.
**Text** will support an HOA in Satilla Shores
**Time** 2020-05-15 21:43:40 UTC

**User** R.O.
**Text**
**Time** 2020-05-15 21:46:56 UTC

**User** B.P.
**Text** We are in too!
**Time** 2020-05-15 21:48:17 UTC

**User** J.G.
**Text** Im in! As we know these protests will probably occur year after year too.
**Time** 2020-05-15 21:58:26 UTC

**User** S.S.
**Text** Then you pay to maintain them, insure them, provide your own security, etc., etc.
**Time** 2020-05-15 22:00:43 UTC

**User** M.C.
**Text** Thsnk you for that good info
**Time** 2020-05-16 01:30:41 UTC

**User** M.C.
**Text** Im in
**Time** 2020-05-16 01:31:22 UTC

**User** A.R.
**Text** We are in for an HOA...
**Time** 2020-05-16 02:23:09 UTC

**User** M.O.
**Text** Hi all! We are interested in exploring as well.
**Time** 2020-05-16 02:38:45 UTC

**User** J.W.
**Text** I am all for it.
**Time** 2020-05-16 04:21:58 UTC

**User** J.W.
**Text** I'm sorry but      is a no on hoa, but be very interested in a neighborhood watch.
**Time** 2020-05-16 18:33:23 UTC

| Facebook Business Record | Page 246 |

**User**

H.B.

**Text** The community would be responsible to pave and maintain roads.
**Time** 2020-05-17 23:23:19 UTC

At trial, McMichael objected that "this post is asking someone to give a legal opinion and there has been no qualification that the person making the legal opinion is, in fact, an attorney." (Doc 249-Pg 34, TR 1404) The government responded that it sought to admit this exchange to show "the individuals in the neighborhood [are] seeking to privatize their streets" and said that it was relevant to show what the neighbors "knew and believed about these streets." (*Id*.) The district court overruled the objection with the explanation that it would charge the jury on the law, and its instructions governed the jury's interpretation of the law. (*Id*.) McMichael did not object at trial that this exchange was hearsay and often double hearsay. Indeed, the government offered the exchange to show "the individuals in the neighborhood [are] seeking to privatize their streets," which is what S.L. says in the very first post on the thread.

The government defends this evidentiary ruling as follows:

> [T]he district court correctly ruled that the discussion among homeowners about whether to privatize their streets was circumstantial corroborating evidence, not a legal opinion about whether the streets were public, and this rationale would overcome a hearsay objection as well. *See United States v. Jiminez*, 564 F.3d 1280, 1287 (11ᵗʰ Cir. 2009); see also Fed. R. Evid. 801(c).

(Br. of Appellee at 41) This is not a fair depiction of the district court's ruling. The district court's only explanation at trial was that the objection was overruled and that it would charge the jury on the law. (Doc 249-Pg 34, TR 1404) The government agrees that this is the only ruling made by the judge. (Br. of Appellee at 40)("[t]he court overruled that objection (Doc. 249, at 34) . . . .") *Jiminez* discusses a statement not admitted to prove the truth of the matter asserted, which is not hearsay under Fed. R. Evid. 801(c); the basis for admission was "the limited purpose of showing" that a co-defendant made that statement to the investigator. *Jiminez*, 564 F.3d at 1287. The government's own explanation about why it sought to admit the Facebook post guts its claim.

McMichael bears the burden of showing plain error; the government bears the burden of showing harmless error. *See United States v. Vonn*, 535 U.S. 55, 58 (2002). Relying on Vicent's testimony

and County records, the government asserts that the "'jury had more than enough evidence to convict'" even absent the Facebook evidence. (Br. of Appellee at 41) It never responds to McMichael's arguments that the Facebook post was the sole evidence about privatization, that it never asked any of the four neighborhood witnesses about the Satilla Shores streets, that the evidence did not duplicate other evidence, and that the district court relied on this exhibit in its order denying the motion for judgment of acquittal. (Br. of Appellant at 56) This is evidence that made a difference. *Cf. United States v. Reed*, 941 F.3d 1018, 1021 (11th Cir. 2019)(recognizing the use this term in plain error analysis).

### 3. __Admission of the faulty affidavit to prove the interstate commerce nexus was erroneous, and it mattered.__

The Eleventh Circuit has declined to deem automobiles *per se* instrumentalities of interstate commerce. *See United States v. Ballinger*, 395 F.3d 1218, 1225 (11th Cir. 2005)(en banc); *see also Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1249 (11th Cir. 2008). The government acknowledges this point. (Br. of Appellee at 51-52)("To be sure, as defendants point out . . ., this Court once declined to decide whether cars are per se instrumentalities of interstate commerce.")

The government sought to prove that McMichael's truck moved in interstate commerce through the testimony of an FBI staff operations specialist. The specialist obtained the truck's VIN from the Department of Motor Vehicles, and based on that VIN, testified that the truck was manufactured in North America. (Doc 250-Pgs 195-96, TR 1565-66) The government then tendered an affidavit that did not conform with Fed. R. Evid. 803(6) or 902(11), and it never provided the defense with the underlying information in discovery. (Doc 250-Pgs 193, 197-98, TR 1563, 1567-68) The district court sustained the defendants' objection to that affidavit. (Doc 250-Pg 201, TR 1571) On the next day, the government asked the specialist about the VIN again, and McMichael objected that the witness was not an expert and lacked personal knowledge. (Doc 251-Pg 90, TR 1743) The district court sustained that objection. (*Id.*) It was only through the third iteration of the affidavit, which carried a date five days after the witness' testimony, that the jury heard that McMichael's truck had been manufactured in Missouri. (Doc 251-Pg 94, TR 1747)

The government argues that "this Court has routinely rejected attempts by defendants to procure relief based on obvious typos." (Br. of

Appellee at 55) None of the cases cited by the government involves trial evidence. *See United States v. Carrasquillo,* 4 F.4th 1265, 1274 (11th Cir. 2021)(remanding since appellate court "may *sua sponte* raise the issue of clerical errors in the judgment and remand with instructions that the district court correct the errors"); *United States v. Roberts*, 308 F.3d 1147, 1156 (11th Cir. 2002)(refusing to reverse where clerical error in indictment listed the wrong year, and observing that "the defendant had abundant notice of the charges and met them head on; he knew that the date cited in the indictment was simply a typographical error"); *United States v. Snyder*, 471 Fed. Appx. 884, 886 (11th Cir. 2012)(noting that search warrant affidavit got an address wrong at one point by transposing numbers, and that the warrant itself contained the correct address). An appellate court cannot *sua sponte* correct trial evidence. This is not a situation where any defendant had "abundant notice" since the government filed its 902(11) notice two days after jury selection started. (Doc 179) And the trial exhibit *was* the actual document upon which to rely (unlike an incorrect affidavit and a correct search warrant).

The government bears the burden to prove an element of a crime beyond a reasonable doubt. Presenting a defective affidavit on the third try does not meet that burden.

### 4. **The government did not prove that McMichael used an instrumentality of interstate commerce as required by the attempted kidnaping statute.**

The kidnaping statute applies to attempts to "seize[], confine[], inveigle[], decoy[], kidnap[], abduct[], or carr[y] away" a person "when. . . the offender uses . . . any instrumentality of interstate . . . commerce in committing or in furtherance of the commission of the offense . . . ." 18 U.S.C. §1201(a)(1), (d). Consistent with the statute, the district court charged the government had to prove that McMichael "used an instrumentality of interstate commerce in attempting to seize or confine Mr. Arbery." (Doc 252-Pg 163, TR 1995) Without objection it defined "instrumentality" as follows:

> Instrumentalities of interstate commerce are the people and the things moving in commerce, including automobiles, airplanes, boats and shipments of goods. . . .

(Doc 252-Pgs 7-9, 164, TR 1839-41, 1996)

These events occurred entirely in a small neighborhood off a state highway after McMichael drove his pickup truck from his driveway,

followed Arbery through the subdivision at low speed, and used a non-moving truck in the final encounter. McMichael's brief acknowledged the holdings of *Lopez* and *Ballinger*. (Br. of Appellant at 62-63) At the same time, it noted that "*Ballinger* 'arguably suggests, without explicitly stating, that persons and things moving in interstate commerce is the full extent of the instrumentalities category." *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1249 (11th Cir. 2008). Like McMichael (Br. of Appellant at 63), the government explains the context of *Garcia*'s words. (Br. of Appellee at 52)

The government asserts that "[o]ther circuits agree that in a kidnapping case, the government need only prove that a defendant used a car during the offense." (Br. of Appellee at 51) To support its position it first cites *United States v. Protho*, 41 F.4th 812, 828 (7th Cir.), *cert. denied*, ___ U.S. ___, 143 S. Ct. 465 (2022). Protho challenged whether the government offered a nexus between his actions and interstate commerce. *Id*. at 827. The district court charged the jury that

> The defendant used a means, facility, or instrumentality of interstate commerce if he used an automobile in committing or in furtherance of the commission of the offense.

*Id.* at 828. The Seventh Circuit rejected Protho's argument that "the Commerce Clause asks us to consider each automobile's specific use in interstate commerce"; the inquiry instead goes to the "*nature* of the regulated object's class." *Id.* (emphasis in original) But it did not matter much in *Protho,* because he drove his car "interstate (from his home in East Chicago, Indiana, to the site of the kidnapping in Calumet City, Illinois)" on the day of the kidnapping. *Id.* at 828. The Court cited cases from the Third, Fourth, Sixth, Eighth, Ninth, and Tenth Circuits concluding that cars are *per se* instrumentalities of interstate commerce. *Id.* at 829. In this litany of law, *Protho* cited *Garcia* as a "but see" case. *Id.*

The government also cites *United States v. Windham*, 53 F. 4th 1006 (6th Cir. 2022). (Br. of Appellee at 51) Windham pleaded guilty to kidnaping and then challenged the factual sufficiency of that plea for the first time on appeal. *Id.* at 1009. Windham's plea provided that he used a cell phone and automobile to commit the crime, but the record did "not establish that [he] used the cell phone or automobile to conduct interstate activity." *Id.* at 1011. No one disputed that the kidnaping took place interstate. *Id.* The Sixth Circuit held that the intrastate use

of phone the phone and the car satisfied §1201(a)'s interstate nexus requirements. *Id. Windham* relied on *United States v. Small*, 988 F.3d 241 (6th Cir. 2021), which McMichael discussed in his brief (Br. of Appellant at 64-65). The government does not address *Small*, particularly the point that the Sixth Circuit described that kidnaping as "atypical" even though the defendants traveled across state lines to commit the crime.

Here, the jury instruction defines an instrumentality as something "moving in commerce, including automobiles . . . ." (Doc 252-Pg 164, TR 1996) McMichael's truck never left a small neighborhood and in the final encounter with Arbery, served only as a barricade.

Respectfully submitted this 24th day of July, 2023.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 4,958 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

This 24th day of July, 2023.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

**CERTIFICATE OF SERVICE**

I served a copy of this Reply Brief on counsel for the government by filing it on the Court's EC/CMF portal, which emails to all counsel of record a link to a file-stamped .pdf copy of the brief.

This 24th day of July, 2023.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

602 Montgomery Street
Savannah, Georgia 31401
912-807-5000
ALC@roco.pro